[Nos. 42555, 42556.   En Banc.   January 17, 1974.]

SPOKANE EDUCATION ASSOCIATION, *Appellant*, v. ORVILLE L. BARNES *et al.*, *Respondents*.

*William J. Powell,* for appellant.

*Winston, Cashatt, Repsold, McNichols, Connelly & Driscoll, Robert W. Winston, Jr.,* and *James P. Connelly,* for respondents.

*George M. Mack,* amicus curiae.

ROSELLINI, J.—This action was begun on April 13, 1972, by the Spokane Education Association, the duly constituted representative of the certificated employees of Spokane School District No. 81, seeking an alternative writ of mandamus of prohibition to prevent the school district from mailing notice of nonrenewal to certain certificated employees of the district, pursuant to a budget reduction plan which it had adopted as a result of the failure of a special school levy. At the conclusion of the hearing on April 19, 1972, the action was dismissed.

It is the position of the association on appeal that the school district, in adopting the plan in the face of a request by the association for negotiations regarding it, violated RCW 28A.72, the negotiations by certificated personnel act.

The statute in question was enacted by the legislature in 1965 and reenacted in 1969. Its purpose is declared to be

to strengthen methods of administering employer-em-

ployee relations through the establishment of orderly methods of communication between certificated employees and the school districts by which they are employed. RCW 28A.72.010.

RCW 28A.72.030 provides:

Representatives of an employee organization, which organization shall by secret ballot have won a majority in an election to represent the certificated employees within its school district, shall have the right, after using established administrative channels, to meet, confer and negotiate with the board of directors of the school district or a committee thereof to communicate the considered professional judgment of the certificated staff prior to the final adoption [of] the board of proposed school policies relating to, but not limited to, curriculum, textbook selection, in-service training, student teaching programs, personnel, hiring and assignment practices, leaves of absence, salaries and salary schedules and noninstructional duties.

RCW 28A.72.060 provides that in the event a matter being jointly considered by the employee organization and the board of directors of the school district is not settled by negotiation, either party may request the assistance and advice of a committee composed of educators and school directors appointed by the State Superintendent of Public Instruction. It provides that the committee shall make a written report with recommendations to both parties within 20 calendar days of the receipt of the request for assistance. It further provides that

[a]ny recommendations of the committee shall be advisory only and not binding upon the board of directors or the employee organization. [1]

RCW 28A.72.080 provides that boards of directors of school districts shall adopt reasonable rules and regulations for the administration of employer-employee relations under that chapter.

Pursuant to that provision, the Spokane Board of Directors adopted a procedure under which it agreed to read the

---

[1]Since the association did not negotiate with the board prior to bringing this action, no resort was had to this procedure.

text of any proposed policy or change of policy at two regularly called public meetings of the board prior to adoption. The regulations provide that the association shall have the right to meet with the superintendent or his designated assistant to communicate the judgment of the certificated staff with respect to a proposed adoption or change of policy. The regulations further provide that if a settlement is not reached with the superintendent, the association shall have the right to meet with the board and communicate its considered judgment with respect to the proposal, and the board is to fix a date for the meeting not more than 10 days after receipt of the request. They provide that if a settlement is not reached, the board may continue to enforce existing policy or take action to adopt new policy, subject to the right of the association to request the assistance of the state superintendent as provided in RCW 28A.72.060.

None of these provisions places any limit on the time within which the association may request negotiations.

On February 22, 1972, the voters of Spokane rejected a special school levy, and at a second election on April 11 rejected it again. In the meantime, the school district superintendent had prepared plans for allocations of the reduction in the budget necessitated by the levy failure. The association's representatives had met with a negotiating team from the superintendent's office and discussed the problem of making budget reductions if the second levy should fail. The association had taken the position that no certificated employees should be discharged and that all of the budget reduction should be allocated to other components of the school system, such as extracurricular activities, buildings, maintenance, contract services and transportation. The plan prepared by the superintendent incorporated a number of suggestions made by the association, but it also provided for a reduction in the number of certificated personnel.

In the interim between the two elections, the school board held two public meetings, one on April 8 which was publicized as a study session and a regular meeting on

April 12, the day following the second election. At the April 8 meeting, the board adopted a plan for administrative and supervisory reorganization which had been proposed by the superintendent. It also studied his plan for budget reduction in the event of levy failure. On the morning of April 12, a negotiating team from the association met with a negotiating team of the school administration. At the conclusion of that meeting, the association negotiators requested negotiations with the board regarding

> budget allocations and other policy decisions relating to the reduced school program necessitated by the April 11th millage failure and prior to the adoption of such decisions.

At 7:30 in the evening of that same day, the board met in regular session and the superintendent's proposals for effecting budget reductions were discussed. A spokesman for the association requested negotiations with the board prior to the adoption of these proposals. One of the board members commented that the board would be willing to negotiate with the association and that it would be "wonderful if such negotiations could result in rehiring." It was stated that, because of the need to notify before April 15, certificated employees whose contracts would not be renewed, the board was in the position of having to act at once.[2] A vote was taken on a motion to adopt the superintendent's proposals, resolutions and guidelines, and the motion passed.

---

[2] RCW 28A.67.070 provides, *inter alia:*

"Every board of directors determining that there is probable cause or causes that the employment contract of an employee should not be renewed by the district for the next ensuing term shall notify that employee in writing on or before April 15th preceding the commencement of such term of that determination of the board of directors, which notification shall specify the cause or causes for nonrenewal of contract . . . If any such notification or opportunity for hearing is not timely given by the district, the employee entitled thereto shall be conclusively presumed to have been reemployed by the district for the next ensuing term upon contractual terms identical with those which would have prevailed if his employment had actually been renewed by the board of directors for such ensuing term."

On April 14, pursuant to the action taken at that meeting, notices of nonrenewal were delivered or attempted to be delivered by the school district to 214 members of the certificated staff.

Before this lawsuit was heard on the 19th of April, the board had offered to negotiate with the association on "matters of mutual concern," and a negotiating session was scheduled on the day the decision of the court was rendered.

Upon these facts the court concluded that the school district had complied with the open meetings law and with the provisions of RCW 28A.72.

The association's first assignment of error is addressed to the superior court's conclusion of law No. 4, to the effect that the right to negotiate under RCW 28A.72 does not include the right to demand that settlement be reached, and that negotiations required by RCW 28A.72 and the procedural rules and regulations were held prior to the April 12, 1972, action of the board.

While in its opening brief the association contended that RCW 28A.72 contemplates that there shall be negotiations until a settlement is reached, that position was abandoned in the reply brief and in oral argument; and as we understand the association, it now agrees with the board that the act does not require negotiation to the point of settlement. Stated another way, the act does not require that settlement must be reached before a school district board of directors can take action upon a proposed policy or change of an existing policy. We think this is a proper reading of the legislative intent expressed in the act.

The association maintains, however, that in refusing to delay its decision to adopt the plan formulated by the superintendent, the board violated the association's rights under the act. In other words, it is its position that the court erred in holding that the negotiations which were conducted prior to the April 12 meeting were sufficient to satisfy the requirements of the statute and the regulations adopted pursuant to that statute.

In connection with this contention, it also assigns error to the court's conclusion of law No. 5, to the effect that the board's action in approving the superintendent's plans for budget reduction was lawful and proper under the circumstances.

RCW 28A.72.030 gives to a properly designated employee organization the right, after using established administrative channels, to meet, confer and negotiate with the board of directors or a committee thereof, prior to the final adoption by the board of proposed school policies relating to the subjects listed therein. It appears to be the association's theory that the school district may not adopt a policy until such negotiations have taken place. While this statutory provision might be open to such a construction, we think that, reading it in conjunction with other statutory enactments which impose upon a board of directors the duty to act before certain statutory deadlines,[3] it must have been the legislative intent that an employee organization, if it wished to negotiate upon a proposed policy, should make its request within a reasonable time prior to the date on which the school district was required to act.

Here, both the district and the association were aware, after the failure of the first levy on February 22, that if a second levy failed and the board found it necessary to make a reduction in certificated staff, notice would have to be sent before April 15. As early as March 22 the association had, in one of its printed circulars, manifested a recognition that possible certificated staff reductions would be considered. It had also expressed a firm commitment on its part not to negotiate such staff reductions. It took this position at a negotiating session with the school district which was held on March 30 at the association's request. The association could have requested further negotiations with the board at the time to discuss tentative plans for limiting staff reduction in the event of a levy failure, but it did not do so. In fact, it never offered to negotiate upon

---

[3] In addition to RCW 28A.67.070, these include RCW 28A.65.040, 28A.65.080 and 28A.65.110.

that subject matter until the night of April 12, when the board found it necessary to take action to authorize the notification of certificated personnel pursuant to RCW 28A.67.070.

We do not think that the objection that the board failed to read the superintendent's proposals at two meetings prior to their adoption, if well taken, is of sufficient substance to justify the association's failure to request negotiations prior to April 12. As the trial court held, circumstances confronting the school board at that time were of such an emergent nature that strict compliance with its own rule was difficult if not impossible.

The association was aware of the problem confronting the board and the necessity for immediate action. Before the April 12 meeting, it could have communicated its considered judgment regarding the proper action to be taken in the event of a levy failure, even though it did not have available the details of the superintendent's proposal. Furthermore, on April 4, the superintendent's recommendations were available and, on April 8 they were discussed at a special meeting of the board. Assuming that the association could not make intelligent recommendations without having before it the superintendent's proposal, that cause for delay was eliminated on April 8, 4 days before the board approved the plan. We think it was its obligation to request negotiations on April 8, if not before, if it wished to exercise the right given under the provisions of RCW 28A.72.

Prior to the time the board took action, it was willing to negotiate its planned staff reductions, even though it took the position that the making up of the budget and the allocations thereunder were not policy decisions at all but rather were actions of an administrative nature. Negotiations did in fact follow, thus indicating that the action taken was not final and conclusive but was an interim action made necessary because of the statutory requirements pertaining to notice to certificated personnel. The parties agree that in fact the proposals of the superintendent were modified after the action approving them was

taken; thus it appears that the association was not in fact denied an opportunity to negotiate upon the question of budget reductions.

The parties are in disagreement as to the scope of mandatory negotiations required by the act and solicit the court's opinion on that subject.

■ The statute gives the employee organization the right to meet, confer and negotiate with respect to school policies related to but not limited to curriculum, textbook selection, in-service training, student teaching programs, personnel hiring and assignment practices, leaves of absence, salaries, salary schedules and noninstructional duties. While the subjects of negotiation are not limited to those included in the list, any additional subjects must be related to those which are listed and, applying the principle of ejusdem generis, they must be of the same kind.

It is the position of the association that this provision is broad enough to give it the right to negotiate with the school district upon the subject of budget allocations. The board, on the other hand, takes the position that the making up of the budget is one of its nondelegable statutory duties, expressly imposed under RCW 28A.58.107, which provides:

> Every board of directors, unless otherwise specifically provided by law, shall:
>
> . . . .
>
> (4) Prepare budgets as provided for in chapter 28A.65 RCW.

It maintains that to negotiate budget allocations would constitute an abdication of that duty. It also points out that the budget includes many items which are only remotely related to the subjects listed in RCW 28A.72.030, such as buildings, maintenance, contract services and transportation, and therefore are not negotiable.

The association, on the other hand, insists that because policies relating to the matters enumerated in the statute necessarily affect the budget, it should have the right to negotiate the allocation of the school district's funds to the

various school activities and functions. Upon this question we are inclined to agree with the position taken by the school board, while recognizing that there is merit to the association's position that policy decisions affecting certificated staff necessarily are reflected in the budget.

Faced with a similar problem of interpretation, the Connecticut court in *West Hartford Educ. Ass'n v. De-Courcy*, 162 Conn. 566, 581, 295 A.2d 526 (1972), observed the difficulty of isolating those matters which affect teachers with sufficient impact to be within the legislative designation of mandatory subjects of negotiation—lumped together in the statute under consideration there under the designation "conditions of employment." That court said:

> Many educational policy decisions make an impact on a teacher's conditions of employment and the converse is equally true. There is no unwavering line separating the two categories. It is clear, nevertheless, that the legislature denoted an area which was appropriate for teacher-school board bargaining and an area in which such a process would be undesirable.

The court noted that the Connecticut legislature had not ventured as far as the Washington legislature in that it did not enumerate a long and detailed list of negotiable items such as our statute does. While recognizing that under the National Labor Relations Act, 49 Stat. 449, as amended, 29 U.S.C. § 151 *et seq.*, the National Labor Relations Board has consistently expanded the number of items which fall within the penumbra of the phrase "other conditions of employment," the court remarked that the phrase nevertheless limits the area of negotiability. It cited *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 222-23, 13 L. Ed. 2d 233, 85 S. Ct. 398, 6 A.L.R.3d 1130 (1946), wherein Mr. Justice Stewart concluded that in many areas the impact of a particular management decision upon job security may be extremely indirect and uncertain and that this alone may be sufficient reason to conclude that such decisions are not " 'with respect to . . . conditions of employment.' " He observed further, in that case, that such

managerial decisions, which lie "at the core of entrepreneurial control," are not subject to the duty to bargain collectively.

Entrepreneurial control is akin to a school district's duty to manage the district's affairs. However, there is a significant difference in that entrepreneurial control is a right reserved by management and not a duty imposed by statute, as is the duty to manage the affairs of a school district.

We do not think that the budget of a school district can properly be considered a statement of policy, although many if not all of the items going into a budget reflect policy decisions. Prior to the preparation of the budget those policy decisions which relate to the matters set forth in RCW 28A.72.030 are subject to negotiation upon proper and timely request of an employee organization, but such an organization has no right to demand that the budget itself be negotiated.

This does not mean that the school district is not permitted to or that it should not in the exercise of its sound discretion seek the advice and views of the certificated personnel acting through their duly constituted representative upon such matters or that it should refuse to consider those views if offered in a timely and appropriate fashion. The fact that it has no mandatory duty to negotiate upon a particular subject matter does not mean that it would not be in the best interest of the school district to do so in a given case.

In an article by Professor Reynolds C. Seitz, Marquette University Law School, a member of the National Academy of Arbitrators and formerly assistant to Superintendent of Public Schools in Omaha and St. Louis, and president of the National Organization on Legal Problems of Education, entitled "School Board Authority and the Right of Public School Teachers to Negotiate—A Legal Analysis," appearing in 22 Vand. L. Rev. 239, 253 (1969), it is said:

> Were school boards to understand that bargaining does not require capitulation but is calculated to bring about harmony and build morale, they would seldom reject a

proposed subject on the ground that it is not within the mandatory area of bargaining.

It may be said that good faith collective negotiations require recognition by both parties, not merely formal but real, that bargaining is a shared process in which each party has a right to play an active role. Each party balances what is desired against known costs of unresolved disagreement. These costs on the one side may be such things as loss of competent employees and the fostering of a general low morale, and on the other side the loss of community support if unreasonable demands are made. There is nothing inherent in the technique of good faith collective negotiations which mitigates against producing a climate that will insure better education for children.

■ The purpose of RCW 28A.72 is declared to be the establishment of orderly methods of communication. Implicit in this is a legislative requirement that both parties to the negotiations authorized thereunder should act in good faith and that each should give the other timely notice of its intended actions with regard to the subjects of negotiation which are set forth in the act. In the exercise of good faith the board or its representatives should listen to the views expressed by the employee organization for a reasonable length of time with an open mind and should weigh its proposals and the alternatives presented with serious attention. Both sides should keep in mind the statutory duties and time limits imposed upon school directors. It is obvious that they cannot be expected to negotiate for an unreasonable length of time or to delay decisions which must be made before statutory or other relevant deadlines. It is the board of directors upon which the duty is imposed by statute to make decisions in managing the affairs of the district and in each case the final decision rests with the board.[4]

Error is assigned to the court's conclusion that the adoption of the superintendent's administrative reorganization proposal was not in violation of the open meetings law,

---

[4]Upon this subject generally *see* E. Shils & C. Whittier, *Teachers, Administrators, and Collective Bargaining* (1968).

RCW 42.30.060 and .080. The association's position is that a notice specifying that a meeting will be a study session is not sufficient notice to permit the transaction of business at such a meeting under the open meetings act. Assuming the validity of this theory, we are nevertheless of the opinion that the court did not err in holding that the action of the board at the April 12 meeting, which was properly called under the act, was broad enough in its scope to include reapproval of the reorganization plan approved at the prior meeting. Compliance with the act was therefore effected.

Finding no error, we affirm the judgment of the trial court dismissing the action.

HALE, C.J., and FINLEY, HUNTER, HAMILTON, STAFFORD, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.