[No. 55802-7. En Banc. August 24, 1989.]

INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL UNION 1052, *Appellant,* v. THE PUBLIC EMPLOYMENT RELATIONS COMMISSION, ET AL, *Respondents.*

*David E. Williams, Critchlow & Williams, James H. Webster, Lynn D. Weir,* and *Webster, Mrak & Blumberg,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Senior Assistant,* for respondent State.

*Perkins Coie,* by *Nancy Williams* and *J. David Andrews,* for respondent Richland.

DURHAM, J.—Local 1052 of the International Association of Fire Fighters (Local 1052) is the bargaining representative of employees of the Richland Fire Department. In 1985, Local 1052 engaged in negotiations with the City of Richland (Richland) on the terms of a successor agreement to the collective bargaining agreement that expired at the end of that year. In the course of negotiations, Local 1052 proposed the following article, entitled "Standards of Safety":

> The articles of this Agreement, providing compensation to members of the bargaining unit, have been negotiated from a base of known working conditions either in effect or proposed to the Union during negotiations for this Agreement. Included in the known working conditions is the level of safety afforded members of the bargaining unit in the performance of their duties. This level of safety is directly related to the number

and type of apparatus and the number and rank of personnel responding to alarms. At this time, the safety of bargaining unit members is afforded at a level, evidenced by the Fire and Emergency Services Department S.O.P. 75–1 as revised January 3, 1980, entitled "First Alarm Assignments",[1] with apparatus referred to in S.O.P. 75–1 manned at the present level which is as follows:

| B/C vehicle | – 1 Battalion Chief |
| Engine Company | – 1 Captain, 2 Fire Fighters |
| Truck Company | – 1 Lieutenant or 1 Fire Fighter |
| Ambulance | – 2 Fire Fighters |

If the Employer wishes to make changes in the aforementioned standards during the term of this Agreement, they shall first advise the Union of the intended change and shall open the contract, if the Union requests, to negotiate compensation for the impact on the level of safety and other areas which would be affected by the Employer's proposed changes.

It shall be understood that the Union does not encourage or condone any actions which increase work hazards for members of the bargaining unit.

This proposal was among several issues referred to interest arbitration by the Public Employment Relations Commission (PERC) in March 1986. Before arbitration proceedings commenced, however, Richland filed a complaint with PERC charging that Local 1052's insistence on bargaining over its proposed article constituted a refusal to engage in good faith collective bargaining. The complaint requests an order barring Local 1052 from continuing to insist on inclusion of the article and removing the article from interest arbitration. PERC's executive director referred the complaint to a hearing examiner and suspended the interest arbitration proceedings pending disposition of the complaint.

Following an evidentiary hearing, the hearing examiner issued findings of fact and conclusions of law and entered an order dismissing Richland's complaint. *Richland v. International Ass'n of Fire Fighters, Local 1052,* Pub. Empl. Relations Comm'n Dec. 2448–A PECB (1987)

---

[1]This policy manual determines the types and numbers of fire fighting apparatus that should be deployed in specific emergency situations.

(examiner's opinion), *reprinted in* 4 Wash. Pub. Lab. L. Rep. 979. On Richland's appeal, PERC reversed. *Richland v. International Ass'n of Fire Fighters, Local 1052,* Pub. Empl. Relations Comm'n Dec. 2448–B PECB (1987). PERC found that Local 1052 had violated its statutory duty to bargain in good faith and ordered Local 1052 to cease and desist from advancing its proposed contract article concerning safety standards. After this ruling was affirmed and ordered enforced by the Benton County Superior Court, Local 1052 brought the present appeal, which we accepted on certification from the Court of Appeals.

The present dispute raises a persistent interpretive issue in the law of labor relations. Under the Public Employees' Collective Bargaining Act, RCW 41.56, Richland and Local 1052 are obligated

> to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such public employer . . .

RCW 41.56.030(4); *see* RCW 41.56.140, .150. The question presented here is whether or not Local 1052's proposed contractual term falls within this mandatory "scope of bargaining".

■ As defined in RCW 41.56.030(4), the duty to bargain extends to "personnel matters, including wages, hours and working conditions . . ." The scope of mandatory bargaining thus is limited to matters of direct concern to employees. Managerial decisions that only remotely affect "personnel matters", and decisions that are predominantly "managerial prerogatives", are classified as nonmandatory subjects. *See Klauder v. San Juan Cy. Deputy Sheriffs' Guild,* 107 Wn.2d 338, 341, 728 P.2d 1044 (1986); *Federal Way Educ. Ass'n v. Board of Directors, Federal Way Sch. Dist. 210,* Pub. Empl. Relations Comm'n Dec. 232–A EDUC (1977); *see also Spokane Educ. Ass'n v. Barnes,* 83 Wn.2d 366, 375, 517 P.2d 1362 (1974); *First Nat'l Maintenance Corp. v. NLRB,* 452 U.S. 666, 69 L. Ed. 2d 318, 101 S. Ct.

2573 (1981). A party commits an unfair labor practice if it insists to impasse on bargaining over a nonmandatory subject. *See Klauder*, at 341–42; *see also NLRB v. Wooster Div. of Borg–Warner Corp.*, 356 U.S. 342, 2 L. Ed. 2d 823, 78 S. Ct. 718 (1958).

In some cases, an employer's decisions on nonmandatory subjects may have effects on mandatory subjects. If the union so requests, such effects must be submitted to negotiation. Thus, for example, while an employer need not bargain with its employees' union concerning an economically motivated decision to terminate a services contract (a nonmandatory subject), it must bargain over how the layoffs necessitated by the contract's termination will occur. *See First Nat'l Maintenance Corp. v. NLRB, supra* at 681–82.

Local 1052 contends that its contract proposal falls within the scope of mandatory bargaining in both of the respects described above. First, it contends that a change in the numbers of fire fighters assigned to particular pieces of fire fighting equipment is a mandatory subject of bargaining. Even if this is not a mandatory subject, moreover, Local 1052 defends its proposed demand for a wage reopener tied to equipment staffing level changes as preservative of its rights to bargain over the effects of staffing changes on the mandatory subjects of workload and safety.[2]

The hearing examiner declined to decide the merits of Local 1052's first argument, but agreed with the union's second contention. From the evidence presented to him, the

---

[2]That workload and safety are conditions of employment, and thus mandatory subjects of bargaining, is not disputed. *See, e.g., Yakima v. Yakima Police Patrolman's Ass'n*, Pub. Empl. Relations Comm'n Dec. 1130–PECB, at 4 (1981) (examiner's opinion); *Narragansett v. International Ass'n of Fire Fighters, Local 1589*, 119 R.I. 506, 508, 380 A.2d 521 (1977); *Fire Fighters Union, Local 1186 v. Vallejo*, 12 Cal. 3d 608, 619–20, 526 P.2d 971, 116 Cal. Rptr. 507 (1974); *Alpena v. Alpena Fire Fighters Ass'n*, 56 Mich. App. 568, 575, 224 N.W.2d 672 (1974), *overruled on other grounds in Detroit v. Detroit Police Officers Ass'n*, 408 Mich. 410, 294 N.W.2d 68 (1980); *see generally* C. Morris, *The Developing Labor Law* 800–01, 813–15 (2d ed. 1983).

hearing examiner found that "a potential exists for staffing decisions to impact workload and safety." To foreclose bargaining over Local 1052's proposal, he held, "is to foreclose the union opportunity to demonstrate an effect" on these mandatory subjects. The hearing examiner determined also that Local 1052's contract proposal "does not limit the prerogative of management to change minimum staffing levels." *Richland,* 4 Wash. Pub. Lab. L. Rep., at 986–88.

In its review of the hearing examiner's findings and conclusions, PERC took a different approach. Equipment staffing, in PERC's view, is a nonmandatory subject of bargaining. PERC is troubled, then, that Local 1052's proposal would require bargaining on this subject, through the device of a wage reopener. Not all changes in staffing levels will affect workload or safety, PERC notes. Thus, in seeking to compel Richland to bargain all such changes, Local 1052 "is attempting to limit a recognized area of management flexibility." *Richland v. International Ass'n of Fire Fighters, Local 1052,* Pub. Empl. Relations Comm'n Dec. 2448–B PECB, at 4 (1987).

The problem with PERC's approach is that it assumes, rather than decides, the dispositive issue in this case: whether Local 1052's proposal regarding equipment staffing and deployment concerns a mandatory subject of bargaining. PERC did not determine *from the facts presented to the hearing examiner* that the substance of Local 1052's contract proposal properly may be regarded as a nonmandatory subject of bargaining. Rather, it treated the issue as already decided; according to PERC, equipment staffing "has previously been held to be a permissive subject of bargaining." Pub. Empl. Relations Comm'n Dec. 2448–B PECB, at 3. This approach is inconsistent with PERC's own well–settled practice of determining scope–of–bargaining questions only "after being fully apprised of the facts of each case." *Wenatchee v. Wenatchee Police Guild,* Pub. Empl. Relations Comm'n Dec. 780 PECB, at 1 (1980); *see* WAC 391–45–550. It is also inappropriate under the law of public employment collective bargaining.

PERC's policy of case–by–case adjudication of scope–of–bargaining issues permits application of the balancing approach most courts and labor boards generally apply to such issues. *See, e.g., First Nat'l Maintenance Corp. v. NLRB, supra; see generally* Annot., *Bargainable or Negotiable Issues in State Public Employment Labor Relations,* 84 A.L.R.3d 242 (1978). On one side of the balance is the relationship the subject bears to "wages, hours and working conditions". On the other side is the extent to which the subject lies "'at the core of entrepreneurial control'" or is a management prerogative. *Spokane Educ. Ass'n v. Barnes,* 83 Wn.2d at 376 (quoting *Fibreboard Paper Prods. Corp. v. NLRB,* 379 U.S. 203, 222–23, 13 L. Ed. 2d 233, 85 S. Ct. 398, 6 A.L.R.3d 1130 (1946)). Where a subject both relates to conditions of employment and is a managerial prerogative, the focus of inquiry is to determine which of these characteristics predominates. *See generally* Clark, *The Scope of the Duty To Bargain in Public Employment,* in *Labor Relations Law in the Public Sector* 81 (1977).

By failing to undertake this sort of analysis in this case, PERC has abdicated its fundamental responsibility to determine the scope of mandatory bargaining under the public employment collective bargaining laws. *Cf. Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 60 L. Ed. 2d 420, 99 S. Ct. 1842 (1979) ("[c]onstruing and applying the duty to bargain . . . are tasks lying at the heart of the [National Labor Relations] Board's function"). The Legislature has delegated to PERC the delicate task of accommodating the diverse public, employer and union interests at stake in public employment relations. PERC's summary disposition of the scope–of–bargaining question presented in this case does not reflect the "particularity and sensitivity" this task requires. *Cf. Newspaper Guild of Greater Philadelphia, Local 10 v. NLRB,* 636 F.2d 550, 563 (D.C. Cir. 1980).

The error of PERC's approach is not only methodological, however. The Commission's ready conclusion that equipment staffing is a decidedly permissive bargaining

subject suggests any of several possible substantive errors of law as well.

First, PERC may have determined that staffing level decisions, whatever their relationship to workload and safety, never can be "working conditions" included within the scope of mandatory bargaining, but can only give rise to effects bargaining. Indeed, this is the view New Jersey's labor commission advocated in a decision cited to PERC by Richland. *In re Newark Firemen's Union,* Pub. Empl. Relations Comm'n Dec. 76–40 (N.J. 1976).[3] When staffing levels have a demonstratedly direct relationship to employee workload and safety, however, we believe that, under appropriate circumstances, requiring an employer to bargain over them will achieve the balance of public, employer and union interests that best furthers the purposes of the public employment collective bargaining laws. We have said as much before, in another case involving fire fighter staffing levels. In *Everett v. Fire Fighters, Local 350,* 87 Wn.2d 572, 555 P.2d 418 (1976), we deferred to arbitration the question of whether a fire fighter union's minimum shift proposal was a mandatory subject of bargaining, noting that

> the size of the crew might well affect the safety of the employees and would therefore constitute a working condition, within the meaning of RCW 41.56.030(4) defining collective bargaining.

*Everett,* at 576. *See also Wenatchee,* Pub. Empl. Relations Comm'n Dec. 780 PECB, at 1 (refusing to establish as a rule that "minimum manning clauses are non–mandatory subjects of bargaining for uniformed employees"); *Fire Fighters Union, Local 1186 v. Vallejo,* 12 Cal. 3d 608, 619–21, 526 P.2d 971, 116 Cal. Rptr. 507 (1974) (equipment staffing proposal might be mandatory bargaining subject if

---

[3]Holding department, fire response and equipment staffing levels to be nonmandatory bargaining subjects, the New Jersey commission concluded that such staffing levels do not "directly concern" the working conditions of workload and safety, but only have the potential to affect these conditions.

connection can be shown to workload or safety); *International Ass'n of Firefighters of Newburgh, Local 589 v. Helsby,* 59 A.D.2d 342, 399 N.Y.S.2d 334 (1977) (same); *Narragansett v. International Ass'n of Fire Fighters, Local 1589,* 119 R.I. 506, 508, 380 A.2d 521 (1977) (station house staffing is mandatory bargaining subject in light of demonstrated relationship to workload and safety); *International Ass'n of Firefighters, Local 314 v. Salem,* 68 Or. App. 793, 684 P.2d 605 (1984) (same with respect to staffing of engine and truck companies); *Erie, Pa. v. International Ass'n of Firefighters, Local 293,* 74 Pa. Commw. 245, 459 A.2d 1320 (1983) (same).

PERC also may have proceeded on the understanding that equipment staffing level determinations are such strong managerial prerogatives that, no matter how directly they affect workload and safety, employers never should be required to bargain over them. The cases just cited authoritatively refute this notion.

Finally, PERC may be suggesting that there is no difference in the strength of the managerial prerogative to effect changes in departmental and shift staffing levels on the one hand, and equipment staffing levels on the other. The law is clear that general staffing levels are fundamental prerogatives of management. Considering the negotiability of a union proposal setting minimum police shift staffing, for example, a PERC hearing examiner observed:

> Whether a community will have a large police force, a small one, or none at all, is a very basic managerial decision which ultimately must be determined by the voting public through its elected representatives.

*Yakima v. Yakima Police Patrolman's Ass'n,* Pub. Empl. Relations Comm'n Dec. 1130–PECB, at 4 (1981) (examiner's opinion). The Massachusetts Labor Relations Commission employed similar reasoning in a case involving a fire department shift staffing proposal. *Danvers v. Local 2038, Int'l Ass'n of Fire Fighters,* Labor Relations Comm'n

Cases MUP–2292, MUP–2299 (Mass. 1977). Requiring bargaining over the proposal, the commission noted, would interfere with

the flexibility of elected officials to determine the amount of fire services to be delivered within the Town . . . Agreement on minimum manning per shift in essence would lock the Town into a certain level of firefighting service for the duration of the collective bargaining agreement. Accordingly, it represents an intrusion into that type of governmental decision which should be reserved for the sole discretion of the elected representatives of all the citizens of the Town, rather than one which must be subjected to the bargaining process with the representatives of the employees hired to deliver the service.

*Danvers*, at 25.

■ Compared with shift staffing, however, equipment staffing is not so importantly reserved to the prerogative of management. The distinction often has been noted in the case law. In the *Yakima Police* case, for example, where a shift staffing proposal was held to be a nonmandatory subject of bargaining, the examiner carefully avoided suggesting any conclusions about equipment staffing:

Whether the number of police officers in a patrol car or the emergency response procedures of the department are mandatory subjects of bargaining is not at issue here.

*Yakima Police*, Pub. Empl. Relations Comm'n Dec. 1130 PECB, at 5 (1981). Decisions from New York and Pennsylvania are even more explicit on the distinction between shift and equipment staffing. In *White Plains v. Professional Fire Fighters Ass'n, Local 274,* 5 Pub. Empl. Relations Bd. § 3008 (N.Y. 1972), New York's labor board held that though overall staffing is a strong managerial prerogative, bargaining may nevertheless be mandatory over equipment staffing levels that are related to fire fighter safety.[4] A Pennsylvania court made the same distinction in *International Ass'n of Fire Fighters, Local 669 v. Scranton,*

---

[4]The New York board's later reversal of this approach, *see White Plains Police Benevolent Ass'n v. White Plains,* 9 Pub. Empl. Relations Bd. ¶ 3007 (N.Y. 1976), reflects not a revision of its judgment concerning the lesser need for management flexibility in setting equipment staffing levels compared with overall staffing, but rather a concern for the burdens case–by–case adjudication would

59 Pa. Commw. 235, 429 A.2d 779 (1981), noting that requiring bargaining over equipment staffing "leaves in the municipality the ultimate decision concerning what level of fire protection it wishes, or can afford, to provide to the citizens." *Scranton,* at 239. *See also Erie, Pa. v. International Ass'n of Firefighters, Local 293, supra.*

PERC's facile characterization of the substance of Local 1052's contract proposal as "a subject that has previously been held to be a permissive subject of bargaining", Pub. Empl. Relations Comm'n Dec. 2448–B PECB, at 3, is inappropriate under the law. Scope–of–bargaining questions cannot be resolved so summarily. Every case presents unique circumstances, in which the relative strengths of the public employer's need for managerial control on the one hand, and the employees' concern with working conditions on the other, will vary. General understandings—such as an understanding that staffing levels typically weigh on the managerial prerogative side of the balance of employer and union interests—may, of course, inform PERC's analysis. But care must be taken to recognize meaningful distinctions in the circumstances of different cases.

In this case, PERC has neglected both sides of the balance. The Commission made no determination on the extent to which Richland's equipment staffing policies affect fire fighter workload or safety. Nor did it independently evaluate the nature of the City's interest in setting equipment staffing levels. In short, PERC has failed to perform the function assigned to it by the Legislature. We remand this matter so that it may do so.[5] *Cf. Newspaper*

---

place on the negotiating process. *See White Plains,* at 3010. Indeed, the distinction the first *White Plains* ruling drew has been lauded as "more nearly correct" than the approach that replaced it. Leonard, *Collective Bargaining on Issues of Health and Safety in the Public Sector: The Experience Under New York's Taylor Law,* 31 Buffalo L. Rev. 165, 174 (1982).

[5]It would seem proper, on remand, for the hearing examiner to make this determination in the first instance. *See* WAC 391–45–310.

*Guild of Greater Philadelphia, Local 10 v. NLRB,* 636 F.2d 550, 561–63 (D.C. Cir. 1980).

The judgment of the Benton County Superior Court is vacated, and the case is remanded to PERC for further proceedings consistent with this opinion.[6]

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, PEARSON, ANDERSEN, and SMITH, JJ., concur.

DORE, J. (dissenting)—I dissent.

The majority lays out the premises for a decision reversing PERC, and then fails to draw the obvious conclusion of its own argument. A hearing was held on Richland's complaint against Local 1052 (hereinafter the Union), and the hearing examiner dismissed the complaint. PERC reversed, but, as the majority relates, it simply disregarded the hearing, deciding the case on an erroneous view of the law. PERC's decision was incorrect. Instead of reversing PERC, however, the majority remands this case for a new determination at another hearing. The remand is entirely unnecessary.

## THE ISSUE

The underlying issue is whether the Union violated its duty to bargain in good faith by insisting to impasse on an *issue which is not the subject of mandatory bargaining.* The contract proposal which the Union insisted on concerns equipment staffing levels. The Union contends that such levels affect safety and are therefore the subject of mandatory bargaining.

---

[6]Parenthetically, we note our agreement in PERC's conclusion that Local 1052's contract proposal is not supportable under the rules of effects bargaining. With respect to effects bargaining, the union's proposal is at best a redundancy; settled law already requires Richland to bargain over the effects of its actions on wages and other mandatory subjects. The proposal goes beyond what the law requires, however, obligating Richland to renegotiate fire fighter wages even absent real effects on mandatory bargaining subjects. This overbreadth, as PERC correctly concluded, renders inappropriate the union's reliance on effects bargaining law.

PERC held that equipment staffing levels were not subject to mandatory bargaining. The majority speculates on the reasoning that might have led PERC to that conclusion, but clearly PERC must have decided that such levels do not affect safety. It is undisputed that matters of safety are subject to mandatory bargaining. The majority decides correctly that PERC's decision was erroneous. Instead of reversing outright, however, the majority remands for a determination on whether equipment staffing levels affect safety and are therefore subject to mandatory bargaining. The majority notes that that determination should be made in the first instance by a hearing examiner. See footnote 5.

The problem is that a hearing examiner has already made that determination. As the majority itself recognizes, PERC did not find fault with the hearing examiner's conclusions. Instead, it simply ignored them. Given that PERC's decision was wrong, as the majority acknowledges, I cannot see any sense in remanding for a hearing that has already been held and the results of which have not been directly challenged. We should simply reverse PERC and reinstate the hearing examiner's dismissal of Richland's claim.

### The Evidence

The hearing examiner's decision that equipment staffing levels do relate to safety was based on a substantial body of evidence, submitted by both sides and carefully considered.

Richland offered the testimony of its fire chief, Robert Panuccio, who contended that the issues addressed in the Union's proposal related to fire fighting effectiveness, not safety, and were therefore managerial considerations not subject to bargaining. He testified that none of the measures already taken to ensure safety related to crew size or equipment staffing levels. He testified that none of the injuries sustained in the recent past related to those levels and opined that smaller crews were in fact more safe than larger crews.

Richland Fire Department's operations chief, Duane Shrag, testified on the safety training of fire fighters. He noted that the procedures were not affected by crew size. He drew the conclusion that equipment staffing levels had no relation to safety.

Shrag and Panuccio both testified regarding existing grievance mechanisms and other opportunities which permit fire fighters to have a say on safety matters. Shrag described specific instances in which those suggestions and complaints had been heeded, and had changed policy.

The Union presented the testimony of an actual fire fighter, Tim Sharp, president of the Union and a lieutenant in the Department. He described his own injuries in the line of duty and explained how they might have been averted by the presence of additional personnel:

> Q . . . the safety that's involved for the people out doing the job is directly in line with the number of people that are there and their qualifications and skills. If you have less people on the scene, then you're not going to have as many people seeing what's going on nor are you going to have the safety factor afforded of somebody being able to drag you out if you get hurt.

Transcript, at 118–19.

Sharp also submitted a report by Warren Kimball, a retired chief fire service specialist for the National Fire Protection Association and apparently an acknowledged expert on fire fighting safety. The Kimball report describes the multiple effects of reduced staffing on safety, including increasing the weight of hose fire fighters must carry and increasing the risk associated with raising and moving ladders. Risk is increased as fire fighters are diverted from manning equipment to rescue operations. Risk is also heightened by an increase in fatigue: a smaller crew may take longer to suppress a fire, leaving fire fighters on the line for longer periods of high–stress duty.

After hearing this evidence, the hearing examiner issued findings of fact and conclusions of law determining that equipment staffing levels do have an impact on safety, that the Union's proposal was therefore a matter of mandatory

bargaining and that the Union therefore could not have violated its duty to bargain in good faith.

### REVIEW AND REMAND

We stated the standards governing review of cases such as this in *Renton Educ. Ass'n v. Public Empl. Relations Comm'n*, 101 Wn.2d 435, 440, 680 P.2d 40 (1984):

> The review procedures of the administrative procedure act must be adhered to in the instant case. This court's review, like that of the superior court, is under RCW 34.04.130(6) which provides:
>
>> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>>
>> (a) in violation of constitutional provisions; or
>> (b) in excess of the statutory authority or jurisdiction of the agency; or
>> (c) made upon unlawful procedure; or
>> (d) affected by other error of law; or
>> (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
>> (f) arbitrary and capricious.
>
> Our review of the administrative decision is limited to the record of the administrative tribunal itself, not to that of the superior court. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 323–24, 646 P.2d 113 (1982).

It is not necessary for this opinion to detail the respects in which PERC's decision is arbitrary and capricious and affected by errors of law. The majority itself demonstrates this clearly enough:

> The problem with PERC's approach is that it assumes, rather than decides, the dispositive issue in this case: whether Local 1052's proposal regarding equipment staffing and deployment concerns a mandatory subject of bargaining. PERC did not determine *from the facts presented to the hearing examiner* that the substance of Local 1052's contract proposal properly may be regarded as a nonmandatory subject of bargaining. Rather, it treated the issue as already decided . . .

Majority, at 202. Reversal is clearly required here.

Where I depart from the majority is in remanding the case. If this were an ordinary civil case, we would reverse the Court of Appeals and reinstate the decision of the trial court. Unless the original trial were tainted by some error, we would not remand for a new trial. Where the error lies solely with the reviewing court, the trial court's first determination stands.

The appellate procedures and standards in administrative cases are not so different from the ordinary civil case that a different practice should govern here. As the majority describes at length, the error lies solely at the level of review: PERC failed to considered the record before it in making its decision; the Superior Court failed to correct PERC's error in this regard. There has been no demonstration at all that the hearing examiner's decision was arrived at improperly or that it is erroneous. Given that the determination at the fact–finding level is trustworthy, there is no justification at all for remanding for further fact–finding. We should reverse outright and reinstate the determination of the hearing examiner.

## CONCLUSION

The majority describes how PERC simply disregarded the hearing examiner's conclusions, rather than reviewing them. PERC therefore reached an erroneous decision. Given that the hearing examiner's determination has never been rejected as erroneous by PERC, I do not see the point of remanding for a new hearing. No one can seriously expect Richland and the Union to introduce different evidence from what has already been presented. Richland has already lost one hearing and is not entitled to a new one. Remanding for a determination on a question which has already been litigated and determined is unnecessary and unfair. I would reverse PERC and reinstate the hearing examiner's decision dismissing Richland's complaint.