[No. 42854-3-I.   Division One.   March 1, 1999.]

KING COUNTY, *Appellant,* v. THE PUBLIC EMPLOYMENT RELATIONS COMMISSION, ET AL., *Respondents.*

*Norm Maleng, Prosecuting Attorney,* and *Alexander Golan, Deputy,* for appellant.

*Kathleen Barnard* of *Schwerin Campbell Barnard, L.L.P.,* for respondents.

AGID, J. — When the Director of the King County Jail ordered nurses at the jail to stop covering their surnames on their identification badges, the Washington State Nurses Association (WSNA) filed an unfair labor practice complaint with the Public Employment Relations Commission (PERC), alleging that the jail had failed to bargain with the nurses as required by the Public Employees Collective Bargaining Act. Both PERC and the trial court agreed with WSNA that the jail was required to bargain over the issue. The jail appeals, alleging that its identification policy is not a mandatory bargaining subject and that the agency's factual findings are unsupported by the record. Because the nurses' legitimate safety concerns are more significant than the jail's interest in the method it uses to identify employees, the jail must bargain over the issue. We therefore affirm the trial court and PERC.

## FACTS

The King County jail is operated through the County's Department of Adult Detention (DAD), which Arthur Wallenstein has directed since August 1990. Health services to the jail's approximately 1,700 inmates are provided through a contract between DAD and the Seattle-King County Department of Public Health. Nearly 700 people are employed in the jail facility, and for many years, DAD has

required that these employees wear identification badges. In 1992, Director Wallenstein issued a directive stating that he and a number of employees had not been wearing their identification badges while at work in the jail. He asserted that this practice compromised jail safety and security and directed that all employees must exhibit an identification badge to enter and leave the jail.

Toward the end of 1994, several corrections officers informed Wallenstein that some nurses were covering the last names on their identification badges with tape or decals.[1] Wallenstein understood that the nurses did this to prevent inmates from knowing their full names. With the assistance of Barbara Hadley, Administrator of the Jail Health Services Section [JHS] of the Department of Public Health, he conducted an investigation. After discussing the matter with other correctional facility administrators from around the country, Wallenstein concluded that because the badge policy was directly related to fundamental security and safety operations at the jail, it should remain in effect. He then issued a second memorandum to all DAD employees, entitled "Restatement of Policy Regarding DAD ID Cards," which directed the employees to wear "unadulterated" name badges at all times while in the secured facility:

> I want to ensure that all DAD staff both know and observe our agency policy on ID cards. Our ID cards serve several purposes: they ensure that we know who staff members are and that we are easily and immediately identifiable by anyone in our facility; they ensure that all who serve the public can be identified by the inmate population as we provide direct services to that group and nothing in our work or policies suggests a policy of secretiveness or fear of name recognition; and, lastly, the ID card serves to distinguish employees from visitors and nonpermanent or perdiem [sic] persons who might enter our facilities.
>
> Our policy has never changed and neither myself nor any

---

[1]Since at least 1987, many nurses in the jail have covered their names. According to several nurses' testimony, Wallenstein had been aware of this practice, but he had never indicated it was a problem until May 1995.

other senior staff member has altered any policy covering the proper wearing of ID cards. All DAD staff are to wear these cards or their name badge (uniformed staff) in full open view and no portion of the first name, last name, or photograph is to be obscured from full public view . . .

. . . I have never known nor worked in a correctional facility where any employee obstructed staff, public or inmate observation of their name or photograph. *I respectfully ask that this directive be followed at once and I thank those involved for their cooperation.* A single standard of openness and accountability must exist for all of us within the adult correctional system in King County.

Soon after Wallenstein issued this memorandum, a group of nurses initiated a meeting with him to express concerns about their personal safety if they were to comply with his directive. Wallenstein refused to rescind his memorandum, but he did state, in an August 29, 1995 letter to Hadley, that to "assist any JHS health care staff who wish to change phone numbers or otherwise alter their movement patterns or means of transportation," he would suspend the policy until October 15, 1995. On September 5, 1995, Hadley issued a memorandum to the jail health staff requesting compliance with Wallenstein's directive.

In response, Joan Matheson, labor representative of WSNA, wrote to Wallenstein requesting a meeting to discuss the nurses' concerns. When Wallenstein failed to reply, she faxed him a petition signed by 64 nurses which began:

We, the undersigned nurses at the King County Adult Detention facility, believe the policy requiring us to openly reveal our last names on our identification badges places us and potentially our families at risk. We respectfully request that we be allowed to reveal our first name and last initial only for reasons of personal safety.[2]

The letter informed Wallenstein that WSNA was planning

---

[2]This petition was entitled, "Nurses at Risk."

to file an unfair labor practice complaint due to the unilateral change DAD had imposed and requested that he contact Matheson by October 2, 1995, if he was interested in resolving the issue without legal action. In a September 26, 1995 letter, Wallenstein responded that the policy was long standing, and therefore not a unilateral change; and that this conflict had arisen because of a perceived double standard in policy between the nurses and other jail employees. He indicated that he would be pleased to meet with Matheson and discuss the matter further. When Wallenstein and other jail representatives conferred with Matheson and a group of nurses on October 9, 1995, Wallenstein maintained that he was committed to the policy and was not required to bargain with the WSNA over this issue.

On October 23, 1995, WSNA filed an unfair labor practice complaint with PERC alleging the jail had unilaterally implemented a change in working conditions without bargaining and requesting a cease and desist order. After an evidentiary hearing, the hearing examiner ruled in favor of WSNA and issued a cease and desist order which PERC upheld on appeal. On May 13, 1998, the King County Superior Court affirmed PERC's decision without additional findings or a written opinion. This appeal followed.

## DISCUSSION

King County contends that the jail's identification policy is not a mandatory bargaining subject, and that PERC's factual findings about WSNA's safety concerns and the availability of suitable alternatives to the Jail's policy are not supported by the evidentiary record. We defer to the agency's factual findings if supported by substantial evidence in the record[3] and review questions of law de novo.

---

[3]*William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 407, 914 P.2d 750 (1996).

We will not overturn an agency order unless the agency erroneously interpreted or applied the law.[4]

■ ■ The duty to bargain derives from the Public Employees' Collective Bargaining Act,[5] which deems an employer's "refus[al] to engage in collective bargaining"[6] an unfair labor practice. A party to a bargaining relationship commits an unfair labor practice if it fails to give notice of a change affecting a mandatory subject of bargaining.[7] Although King County argued below that Wallenstein's directive constituted a renewed commitment to a policy which was already in effect, King County now impliedly concedes that "renewal" of a policy which had not been adhered to for a decade constitutes a change in working conditions. Because it is undisputed that King County and WSNA were parties to a collective bargaining agreement,[8] the question is whether the change—mandating that jail employees reveal their full names on their identification badges—is a mandatory bargaining subject.

■ As defined in RCW 41.56.030(4), the duty to bargain extends to "personnel matters, including wages, hours and working conditions . . . ." These are mandatory subjects of bargaining, while issues that only remotely affect personnel and matters that are predominantly "managerial

---

[4]*City of Pasco v. Public Employment Relations Comm'n*, 119 Wn.2d 504, 833 P.2d 381 (1992). Citing *Pasco*, the WSNA claims that we must place "substantial weight" on PERC's order because PERC possesses expertise in the statute's subject matter. But the *Pasco* court recognized that deference to agency expertise is not necessary when the statute at issue is not ambiguous. *Id.* at 507. Neither party asserts RCW 41.56.030(4) is ambiguous, so PERC's decision is not entitled to substantial weight.

[5]RCW 41.56

[6]RCW 41.56.140.

[7]*City of Brier & Serv. Employees Int'l Union, Local 120*, Dec. 5089-A (PECB, Oct. 13, 1995).

[8]The King County Jail and WSNA were parties to a collective bargaining agreement for the period from January 1, 1994, through December 31, 1996, covering a bargaining unit of licensed practical nurses and registered nurses working in the jail.

438

prerogatives," are nonmandatory subjects.[9] When, as here, the disputed issue could fall into either category, we must balance the relationship the subject bears to personnel matters against the extent to which the issue pertains to fundamental management prerogatives.[10] We must then determine which characteristic predominates.[11] As the Washington Supreme Court has observed, "Every [scope of bargaining] case presents unique circumstances, in which the relative strengths of the public employer's need for managerial control on one hand, and the employees' concern with working conditions on the other, will vary."[12]

■ King County asserts that the jail's name badge policy is a fundamental management prerogative which directly affects the "operational integrity of the jail." It claims that if decisions such as this one "were required to be made through the Jail's negotiations with its eleven different bargaining units, the result would be chaos and possible loss of control over a facility which necessarily requires strict and careful control over matters affecting security." King County cites numerous sources which support its argument that decisions affecting the safety and security of correctional facilities must remain in the hands of the correctional administrator. To tailor those sources to the facts of this case, King County cites two cases which held that employers were not required to bargain with employees over uniform changes which were implemented to further the facilities' missions.[13] Those cases are not helpful here,

---

[9]*International Ass'n of Firefighters, Local 1052 v. Public Employment Relations Comm'n*, 113 Wn.2d 197, 200, 778 P.2d 32 (1989).

[10]*Id.* at 203.

[11]*Id.* (citing R. Theodore Clark, Jr., The Scope of the Duty to Bargain in Public Employment, in LABOR RELATIONS LAW IN THE PUBLIC SECTOR 81 (Andria S. Knapp ed., 1977)).

[12]*Firefighters*, 113 Wn.2d at 207.

[13]*American Fed. of Gov't Employees, Local 2441 v. Federal Labor Relations Auth.*, 864 F.2d 178 (1988) (Bureau of Prisons was not required to bargain with guards over change in necktie and blazer requirement.); *Division of Military & Naval Affairs, State of N.Y. and New York Council, Ass'n of Civilian Technicians*, 15 FLRA 288, 293 (July 17, 1984).

however, because the employees in those cases were not relying on personal safety concerns. When union members' reasons for objecting to a proposed policy are not compelling, their interests are clearly outweighed by those of an employer who relies on internal order and discipline as a reason for the policy. But here, the nurses object to the jail's policy because they believe it will jeopardize their safety, a much more significant concern that those raised in the cases King County relies on.

King County correctly points out that even where verifiable safety considerations are involved, the interests of the employer must be weighed against those of the union before we can impose a duty to bargain.[14] King County claims that WSNA has offered no specific evidence that nurses will be endangered by this policy, and that mere allegations of safety impacts do not turn a management prerogative into a mandatory subject of bargaining. While this argument has a superficial appeal, King County does not explain how the nurses can allege impacts with specificity when most of them have covered the surnames on their identification badges since they started working at the jail.[15]

Of the 84 nurses represented by WSNA who work at the jail, 64 signed the "Nurses at Risk" petition requesting that they not be required to reveal their last names. At the July 30, 1996 evidentiary hearing, at least six of these nurses testified that when they were hired, either their supervisors or their peers told them that it was "the practice" to cover the last name on their identification badge for reasons of personal safety,[16] that they had

---

[14]*City of Centralia & International Ass'n of Fire Fighters Local 451*, Dec. 5282-A (PECB, June 18, 1996).

[15]The "Nurses at Risk" petition was signed by 75 percent of the nurses. We assume most of these nurses cover their surnames. In addition, several nurses testified that inmates have threatened them, flirted with them, and called them at home. As PERC recognized, "the fact that more serious incidents have not occurred may be attributable, at least in part, to the nurses' practice in covering their surnames on their ID badges."

[16]One nurse testified that she specifically asked during orientation if she was required to reveal her full name, and her recruiters said she was not. Others testified that they had not specifically inquired. They were simply informed by peers or supervisors that it was "recommended."

continuously covered their last names without protest until Wallenstein's directive, and that this issue was important to them because they did not want inmates to have easy access to their home phone numbers and addresses. This nurse's account is representative:

> I worked in very close physical proximity to inmates. The people I see are obviously many times very distressed. They're under the influence of drugs or alcohol oftentimes. They can be chronically or acutely mentally ill. And given my proximity, given the direct hands-on contact I often have with people, their proximity to seeing my name tag and who I am, and angry as they can get at times with me as a health care professional, if I don't do something that they want me to do for them, if they feel that somehow I've wronged them in some way, I don't want them to know my full name because I don't want them to have access to me outside of the workplace.

None of the testifying nurses stated they believed that covering their last names would ensure absolute safety, and the nurses recognize that if the inmates legitimately allege insufficient care, the nurse's full name will be provided. But, as one nurse testified, the practice offers a substantial measure of reassurance because it requires the inmates "to go through several steps" before learning a nurse's full name.

The National Labor Relations Board has stated that if a proposed change is of "legitimate concern" to the union, the employer should be required to bargain.[17] Similarly, PERC "seriously considers any attempt to undermine the safety of employees"[18] and, if the foreseeable risk to employees is "significantly aggravated" by a policy change, the employer must bargain. We agree with PERC and the trial court that the nurses' safety concerns are legitimate and are significantly aggravated by the identification badge policy. While we recognize that King County has an

[17]*Northside Ctr. for Child Dev.*, 310 NLRB 105 (1993). Decisions construing the National Labor Relations Act are persuasive when construing RCW 41.56.160. *Nucleonics Alliance, Local 1-369 v. Washington Pub. Power Supply Sys.*, 101 Wn.2d 24, 677 P.2d 108 (1984).

[18]*City of Centralia*, at 11.

important interest in ensuring that jail employees are properly identified,[19] its interest in the *method* of identification is less significant, and is outweighed by the nurses' safety concerns. While we express no opinion on the proper outcome of negotiations between WSNA and the jail, the jail identification badge policy is a mandatory bargaining subject.

Affirmed.

KENNEDY, C.J., and BAKER, J., concur.

---

[19]King County also asserts that the record does not support PERC's finding that the jail can use alternatives such as "badge numbers, initials, or pseudonyms" to resolve this issue. Even if the County is correct, the availability of alternatives has no bearing on an employer's duty to bargain. And notably, King County offered no evidence that security has been compromised by the nurses' practices in the last decade.