COURT OF APPEALS D
2016 MAR 21  AH 9: 0



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| KITSAP COUNTY and KITSAP COUNTY SHERIFF, | ) ) ) | No. 73637-0-I |
| Respondents, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| KITSAP COUNTY CORRECTIONAL OFFICERS' GUILD, INC., and PUBLIC EMPLOYMENT RELATIONS COMMISSION, | ) ) ) ) ) | PUBLISHED OPINION |
| Appellants. | ) ) ) | FILED: March 21, 2016 |

BECKER, J. — Faced with a directive from the board of county commissioners to cut the budget of the sheriff's office, the Kitsap County Sheriff laid off two jail officers. The officers' union, appellant Kitsap County Correctional Officers' Guild, demanded to bargain the layoff decision. Kitsap County and the Kitsap County Sheriff (the county) refused and proceeded to obtain a declaratory judgment that the layoff decision was not a mandatory subject of bargaining. The court perceived the Guild's position as a demand to bargain the level of funding allocated to the jail's budget. This was error. The subject of the demand to bargain was the layoff decision, not the budget. Adopting a budget is a

management prerogative. But when a public sector employer proposes to balance the budget by laying off workers who are represented by a union, the union must have the opportunity to bargain over whether the cost saving can be achieved by other means.

The Public Employees' Collective Bargaining Act, chapter 41.56 RCW, requires a public employer to bargain collectively with a union representing its employees. Mandatory bargaining subjects include wages, hours, and working conditions. Permissive bargaining subjects include managerial decisions that only remotely affect personnel matters and decisions that are predominantly managerial prerogatives. Kitsap County v. Kitsap County Corr. Officers' Guild, Inc., 179 Wn. App. 987, 998, 320 P.3d 70 (2014). Parties to a collective bargaining agreement *must* bargain on mandatory subjects. They *may* bargain on permissive subjects, but they are not obliged to bargain to impasse. If an employer makes a unilateral decision regarding a permissive bargaining subject, the employer is still required to bargain over the effects of the decision upon a mandatory subject such as wages, hours, and working conditions. Kitsap County, 179 Wn. App. at 997-98.

In February 2011, the county was still experiencing budgetary problems stemming from the 2008 recession. The board of county commissioners notified all county employees to expect more budget cuts in the 2012 budget as revenues were still declining.

The sheriff operates and supervises the county jail. Of the portion of the overall budget allocated to the sheriff by the county commissioners, the sheriff

has the authority to determine how funds will be distributed and utilized within the programs of the sheriff's office.

In 2011, the most recent collective bargaining agreement between the county and the Guild had expired two years earlier. Negotiations for a new agreement had twice reached an impasse. The parties were certified for an interest arbitration that had not yet occurred.

In the last quarter of the year, the jail projected that its revenues would be reduced by $935,000. On October 24, 2011, corrections chief Ned Newlin sent an email to all correctional officers entitled "2012 Budget Update." He explained that even after some significant cuts had been made to supplies and services, "the bottom line is that the Sheriff's Office (including the jail) is now directed to take an additional $513,000 cut from our budget requests for 2012."

Newlin announced that the sheriff's office would take the cut by eliminating three positions in the jail—the two correctional officer positions lowest in seniority and an open position. Newlin stated in the letter, "This is not a decision that was made lightly and it causes me great angst to do so, but there is no other reasonable alternative available to us."

The next day, Newlin received a demand to bargain letter from the president of the Guild. The Guild represents correctional officers who are responsible for the housing, control, and care of the inmates. The letter stated, "We are demanding to bargain the decision to conduct any layoffs plus any associated effects/impacts. Layoffs are a mandatory subject of bargaining [and] our input was not invited or incorporated in the discussions you held with two of

3

our bargaining unit members this afternoon." The Guild requested that the status quo be maintained until the parties had bargained the layoff decision and reached an agreement. The Guild was prepared to "explore some potential cost saving measures with the County to at least avoid one of the layoffs, if not both."

The county engaged only in impacts bargaining, limited to voluntary layoff procedures, changes in duties as a consequence of the layoffs, and safety issues. The county did not retreat from its refusal to bargain the layoff decision itself. The layoff of two correctional officers was effective on January 1, 2012.

The county brought the dispute directly to superior court through a complaint for a declaratory judgment. The Public Employee Relations Commission (PERC) is empowered to enforce the act, but its jurisdiction is not exclusive. Because interpretation of a statute is a question of law, the superior court may also decide in the first instance whether an unfair labor practice exists under a particular set of facts. State ex rel. Graham v. Northshore Sch. Dist. No. 417, 99 Wn.2d 232, 239-40, 662 P.2d 38 (1983). The county chose the superior court as a forum rather than PERC because in the county's view, PERC's decisions have created uncertainty about when layoffs are a mandatory subject of bargaining.[1]

It is an unfair labor practice to refuse to bargain a mandatory subject to impasse. It is also an unfair labor practice to demand to bargain a permissive subject to impasse. Kitsap County, 179 Wn. App. at 998. The county's complaint asked the court to declare that the Guild committed an unfair labor practice when

---

[1] Brief of Respondents at 32.

it insisted that the layoff decision was a mandatory subject. The Guild cross-claimed and moved for summary judgment declaring that the county had committed an unfair labor practice by refusing to bargain the layoff decision. After a hearing, the court signed a proposed order granting the county's motion and denying the Guild's motion. The Guild appealed.

That first appeal was decided by Division Two of this court in March 2013. Kitsap County, 179 Wn. App. at 987. The court determined that the issue of layoffs was related both to a mandatory subject of bargaining and a permissive subject. In such a case, a balancing test is used to determine which characteristic predominates. Int'l Ass'n of Fire Fighters, Local Union 1052 v. Pub. Emp't Relations Comm'n, 113 Wn.2d 197, 203, 778 P.2d 32 (1989).

Under RCW 41.56.030(4), the duty to bargain extends to "personnel matters, including wages, hours and working conditions."[2] "The scope of mandatory bargaining thus is limited to matters of direct concern to employees. Managerial decisions that only remotely affect 'personnel matters', and decisions that are predominantly 'managerial prerogatives', are classified as nonmandatory subjects." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 200.

---

[2] As defined by the act:
"Collective bargaining" means the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such employer.
RCW 41.56.030(4).

The court found the record inadequate to determine whether the trial court had engaged in the balancing analysis.[3] "Arguably, the layoffs heavily impact employees' working conditions, but, on these facts, the County's duty to implement a budget weighs on the management prerogative side of the balance. With such significant interests on each side of the balance, it is important that the trial court carefully consider the specific facts of this case and balance the competing interests." Kitsap County, 179 Wn. App. at 999. Following International Association of Fire Fighters, the court remanded "for the trial court to conduct a balancing test based on the facts of this case." Kitsap County, 179 Wn. App. at 1000.

On remand, PERC moved for permission to intervene in view of its interest in promoting uniform application of the law of labor relations in the area of public employment, see RCW 41.58.005(1), particularly its interest in developing uniform standards for determining what subjects of bargaining are mandatory. The trial court allowed intervention. The parties submitted additional evidence and briefing. In August 2014, the trial court again ruled in favor of the county. This time, to demonstrate application of the balancing test, the court adopted and entered findings and conclusions prepared by the county. The findings of fact are undisputed:

1. The evidence before this Court was well developed, including testimony and exhibits submitted to the Court from the record in a four-day interest arbitration hearing.

---

[3] The trial court had inquired of the parties whether the order was sufficiently detailed and was advised by both parties that it was.

2. The Kitsap County Board of Commissioners adopts an annual budget fixing revenues and expenditures for the ensuing fiscal year.

3. In adopting a budget the Board of County Commissioners takes into consideration revenue sources including revenue from property and sales taxes, reductions in revenue from annexations, the existence or elimination of grant funding, the County's debt servicing obligations, and managing reserves.

4. In adopting a budget the Board of County Commissioners takes into consideration expenditures necessary to provide public services, including whether the services are mandated by law or proprietary, the level of services needed, and the amount of revenues available to fund particular services.

5. The Kitsap County Sheriff's Office is limited in the making of expenditures or incurring of liabilities as fixed in the budget by the Board of County Commissioners.

6. For year 2012, the Kitsap County Board of County Commissioners adopted a budget reducing the Sheriff's jail budget by $935,000 because of declining County revenues.

7. The Sheriff's Office reduced the jail's budget by $935,000 as established in the budget adopted by the Board of County Commissioners.

8. The Sheriff's Office reduced the jail's budget in part by eliminating two corrections officer positions.

9. On October 24, 2011, two corrections officers were informed that their positions would be eliminated and they would be laid off as of January 1, 2012, due to the budget reduction.

10. The Corrections Officers' Guild demanded to bargain the layoffs, and the County agreed to bargain the impact of layoffs, and did bargain the impact with the Guild.

11. Two corrections officers were laid off on January 1, 2012.

12. No allegation or evidence exists that the reduction of the County's or Sheriff's budget, the elimination of two corrections officer positions, or the layoff of two corrections officers was motivated by retaliation.

The court concluded from the findings that the layoff decision was a permissive subject of bargaining. The Guild and PERC appeal from this decision.

We must first decide what standard of review to apply. The county suggests that the findings of fact entered by the court are entitled to deference.

7

But the findings of fact do not resolve conflicts in evidence. Because there is no genuine issue of material fact and only the court's conclusions are disputed, it is appropriate to treat the declaratory judgment as an order resolving cross motions for summary judgment. Our review is de novo. CR 56(c); Kitsap County, 179 Wn. App. at 997.

Two United States Supreme Court cases provide the framework for analyzing whether a layoff decision will be classified as permissive or mandatory: Fibreboard Paper Products Corp. v. National Labor Relations Board, 379 U.S. 203, 85 S. Ct. 398, 13 L. Ed. 2d 233 (1964), and First National Maintenance Corp. v. National Labor Relations Board, 452 U.S. 666, 101 S. Ct. 2573, 69 L. Ed. 2d 318 (1981). In Fibreboard, employees were laid off as a result of the employer's decision to contract out the work union employees had been performing. In that situation, the Court held the layoffs to be a mandatory bargaining subject. Because the decision did not alter the employer's basic operation, requiring the employer to bargain "would not significantly abridge his freedom to manage the business." Fibreboard, 379 U.S. at 213. The Court noted that the employer was induced to contract out the work by assurances that economies could be derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments, all of which had "long been regarded as matters peculiarly suitable for resolution within the collective bargaining framework." Fibreboard, 379 U.S. at 213-14.

> Yet, it is contended that when an employer can effect cost savings in these respects by contracting the work out, there is no need to attempt to achieve similar economies through negotiation with existing employees or to provide them with an opportunity to

8

negotiate a mutually acceptable alternative. The short answer is that, although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation.

. . . While "the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position." [National] Labor [Relations] Board v. American Nat. Ins. Co., 343 U.S. 395, 404, [72 S. Ct. 824, 829, 96 L. Ed. 1027 (1952)] it at least demands that the issue be submitted to the mediatory influence of collective negotiations. As the Court of Appeals pointed out, "[i]t is not necessary that it be likely or probable that the union will yield or supply a feasible solution but rather that the union be afforded an opportunity to meet management's legitimate complaints that its maintenance was unduly costly."

Fibreboard, 379 U.S. at 214.

By contrast, First National is a case where the employer made an economically motivated decision to shut down a part of its business. First Nat'l, 452 U.S. at 680. As a result of a financial dispute with one of its customers, the employer terminated the contract and discharged the employees who worked for that customer. The employer claimed it had no duty to bargain about its decision to terminate operations, and the court agreed. The issue raised was whether the shutdown decision should be considered part of the employer's "retained freedom to manage its affairs unrelated to employment." First Nat'l, 452 U.S. at 677. The Court concluded that "the harm likely to be done to the employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." First Nat'l, 452 U.S. at 686.

9

Washington courts and PERC follow Fibreboard and First National. The parties agree that under First National, there is no duty to bargain when layoffs are an indirect result of programmatic or service changes by the employer. They also agree that under Fibreboard, bargaining the layoff decision is mandatory when an employer decides to reduce labor costs by replacing union workers with nonunion workers. The county argues that when a public employer lays off employees in response to a budget shortfall, it is more like the partial shutdown of operations in First National. In the county's view, the decision to layoff the two correctional officers implicated a core management prerogative: the county's duty to maintain a balanced budget.

The trial court ratified the county's position that the layoff decision was a component of the decision to reduce the jail's budget. Although the findings of fact correctly state that the Guild "demanded to bargain the layoffs," the court did not balance the competing interests involved in the layoff decision. Rather, the court balanced the competing interests in "the decision to reduce the budget, reduce staffing levels, and layoff employees."

> Balancing the relationship between the decision to reduce the budget, reduce staffing levels, and layoff employees bears to conditions of employment on the one side, and to entrepreneurial control or management prerogative on the other, the Court must determine which characteristic predominates.[4]

The court concluded, "The decision to reduce the budget and staffing levels lies at the core of entrepreneurial control and management prerogative."[5] The court reasoned that the layoff decision was a result of the decision to reduce the

---

[4] Conclusion of Law B.
[5] Conclusion of Law D.

10

budget and was therefore necessarily and inherently a management prerogative: "the decision involves the performance of statutory duties in that the Board of County Commissioners has a statutory duty to adopt a budget and the Kitsap County Sheriff's Office must abide by the budget adopted for it by the Commissioners."[6] The court concluded that bargaining over the layoffs could not be fruitful "because the employer cannot negotiate the level of revenues and expenditures fixed and adopted in the budget."[7]

In applying the balancing test, the first step is to characterize accurately the decision that is the subject of the bargaining demand. The county's position on appeal depends entirely on redefining the Guild's position as a demand to bargain over the reductions in the budget. The county claims the Guild demanded to bargain "the Board's decision to reduce the budget in order to balance expenditures with revenues."[8] If that were true, the county's position would likely prevail. A public employee organization does not have the right to negotiate with the employer "upon the subject of budget allocations." Spokane Educ. Ass'n v. Barnes, 83 Wn.2d 366, 374, 517 P.2d 1362 (1974). As stated in PERC's brief, "Funding rates, allocation of county budget among county agencies and similar decisions are properly decisions of the voters and elected public officials."[9]

Contrary to the county's rhetoric about the budget, however, the record is clear that the Guild's demand was only to bargain over the layoff decision. The

---

[6] Conclusion of Law F.
[7] Conclusion of Law G.
[8] Brief of Respondents at 27.
[9] Brief of Appellant PERC at 29.

11

Guild consistently recognized that it was the prerogative of the county commissioners to reduce the jail's budget to meet the shortfall in revenues. The budget set for the jail by the county commissioners did not specifically require or itemize layoffs of employees. The Guild demanded to bargain over the jail's decision to achieve the reduction by laying off two employees. By mischaracterizing the Guild's position as a demand to bargain the budget, the county thoroughly undermines its argument. The layoff decision alone was the subject of the Guild's demand to bargain.

It is also inaccurate for the county to say that the Guild was demanding to bargain over "staffing levels." In using that phrase, the county invokes the principle that "general staffing levels are fundamental prerogatives of management." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 205. That principle, however, refers to programmatic decisions about how large or how small an agency should be as a matter of policy—for example, whether a community "'will have a large police force, a small one, or none at all.'" Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 205, quoting Yakima v. Yakima Police Patrolman's Ass'n, Pub. Empl. Relations Comm'n Dec. 1130-PECB, at 4 (1981) (examiner's opinion). Chief Newlin did not decide as a matter of policy that the jail staff had become too large. He did not announce a programmatic decision to reduce inmate population or reorganize the jail's services in a way that could be managed with fewer correctional officers. Indeed, he expressed "great angst" at having to cut staff. His layoff decision represented his unilateral judgment that laying off the two officers was the only way to comply with the

budget set by the county commissioners after all other possible cuts had been considered and implemented. For this reason, his layoff decision was not analogous to the employer's decision in First National to shut down the part of the operation affected by the loss of a customer. It was a decision to reduce labor costs in order to meet the budget cut.

All parties cite and discuss decisions by PERC in support of their respective positions. Administrative decisions are not binding on a court, but a court may find guidance in an agency's interpretation of the law. Miotke v. Spokane County, 181 Wn. App. 369, 325 P.3d 434, review denied, 181 Wn.2d 1010 (2014).

The county claims PERC's decisions are inconsistent with each other. The county cites 10 cases to demonstrate the alleged inconsistency.[10] The cited

---

[10] Pub. Sch. Emps. of Wenatchee v. Wenatchee Sch. Dist., No. 7425-U-88-1542, 1990 WL 656165 (Wash. Pub. Emp't Relations Comm'n Sept. 1, 1990); Pub. Sch. Emps. of Wash. v. N. Franklin Sch. Dist., No. 12665-U-96-3022, 1998 WL 84382 (Wash. Pub. Emp't Relations Comm'n Feb. 1, 1998); Anacortes Police Guild v. City of Anacortes, No. 13634-U-98-03336, 2000 WL 1448857 (Wash. Pub. Emp't Relations Comm'n July 5, 2000); Wash. State Council of County & City Emps. v. Tacoma-Pierce County Health Dep't, No. 14710-U-99-03693, 2001 WL 1069585 (Wash. Pub. Emp't Relations Comm'n April 26, 2001); Wash. Fed'n of State Emps. v. State Attorney Gen., No. 21156-U-07-5399, 2010 WL 1644961 (Wash. Pub. Emp't Relations Comm'n April 16, 2010); Wash. Fed'n of State Emps. v. State Corrs., No. 23325-U-10-5941, 2011 WL 1979692 (Wash. Pub. Emp't Relations Comm'n May 10, 2011); Kirkland Police Officers' Guild v. City of Kirkland, No. 22415-U-09-5718, 2012 WL 1385445 (Wash. Pub. Emp't Relations Comm'n April 13, 2012); Bellevue Police Support Guild v. City of Bellevue, No. 22416-U-09-5719, 2012 WL 1385444 (Wash. Pub. Emp't Relations Comm'n April 13, 2012); Int'l Ass'n of Fire Fighters, Local 451 v. City of Centralia, No. 11233-U-94-2625, 1996 WL 387999 (Wash. Pub. Emp't Relations Comm'n June 1, 1996); Teamsters Local Union 252 v. Griffin Sch. Dist., No. 22170-U-08-5653, 2010 WL 2553112 (Wash. Pub. Emp't Relations Comm'n June 18, 2010).

cases, however, show PERC to be consistent.[11] In seven of them, PERC ruled that a reduction in staffing was not a mandatory subject of bargaining where the employer was closing operations, reorganizing, or changing the scope of services.[12] Another was decided on the ground that although the decision to conduct layoffs was "within the 'mandatory' category," the union waived its right to bargain layoff decisions.[13] In two cases that did not involve a change in operations or services, PERC ruled that the employer had a duty to bargain the layoff decisions because the employer was making layoffs to save labor costs.[14] In these cases and others, PERC has maintained the distinction that flows from Fibreboard and First National: generally, a layoff decision motivated by budget cuts is a mandatory subject of bargaining because of the impact it has on wages, hours, and working conditions, while a decision to change an agency's programmatic priorities or scope of operations is a permissive subject because it implicates management prerogatives.

---

[11] It is true that two different PERC hearing examiners heard nearly identical cases and ruled opposite on the duty to bargain issue. See Kirkland Police Officers' Guild v. City of Kirkland, No. 22415-U-09-5718, 2010 WL 4058051 (Wash. Pub. Emp't Relations Comm'n Oct. 7, 2010); Bellevue Police Support Guild v. City of Bellevue, No. 22416-U-09-5719, 2010 WL 3283656 (Wash. Pub. Emp't Relations Comm'n Aug. 12, 2010). But PERC has since reconciled these conflicting decisions. See City of Kirkland, 2012 WL 1385445; City of Bellevue, 2012 WL 1385444.

[12] Wenatchee Sch. Dist., 1990 WL 656165; State Attorney General, 2010 WL 1644961; City of Anacortes, 2000 WL 1448856; Tacoma-Pierce Health, 2001 WL 1069585; State Corrs., 2011 WL 1979692; City of Kirkland, 2012 WL 1385445; City of Bellevue, 2012 WL 1385444.

[13] N. Franklin Sch. Dist., 1998 WL 84382, at *2.

[14] City of Centralia, 1996 WL 387999; Griffin Sch. Dist, 2010 WL 2553112.

Three PERC decisions in particular are illustrative. The first involved the Wenatchee School District's decision to convert from half-day to full-day kindergarten as a means of managing a budget crisis.[15] Making the change to full day kindergarten resulted in the elimination of mid-day bus runs, and that saved the school district the wages and benefits for the bus drivers who had driven those runs. PERC rejected the union's argument that the decision to convert to full-day kindergarten had to be bargained. PERC's decision cited Spokane Educ. Ass'n, 83 Wn.2d at 366, recognizing and applying the principle that an employer has "no duty to bargain the decision to reduce its budget."[16] Noting that the decision was "clearly a decision regarding the educational program to be offered," PERC concluded that the employer's prerogative of defining the curriculum outweighed the decision's relationship to the wages, hours and working conditions of the employees.[17]

In PERC's Wenatchee School District decision, like in First National, management interests predominated because the decision at issue involved a change in services or a closure of facility or operations. On the other side of the spectrum is a PERC case where the Griffin School District responded to a budget squeeze by reducing the school calendar from 260 working days to 240 working days, with the result that union employees lost 20 days of paid work.[18] PERC concluded that the reduction in the work calendar was a mandatory subject of bargaining. The district was not reducing its services or closing its facilities on

---

[15] Wenatchee Sch. Dist., 1990 WL 656165.
[16] Wenatchee Sch. Dist., 1990 WL 656165, at *4.
[17] Wenatchee Sch. Dist., 1990 WL 656165, at *4.
[18] Griffin Sch. Dist., 2010 WL 2553112.

certain days. Thus, its decision did not implicate the entrepreneurial right of employers to control the level of service they provide. "Despite the employer's legitimate need to achieve budgetary savings, the decision to close facilities for 20 days impacted employee wages and hours so substantially that the decision must be bargained."[19] The union, PERC concluded, had a "legitimate interest in being afforded the opportunity to work with the employer through collective bargaining to provide possible alternatives to reducing the wages and hours of certain of its bargaining unit employees."[20]

In the third case, PERC ruled that King County's decision to furlough its employees was a mandatory subject of bargaining.[21] King County faced budget deficits and revenue shortfalls as a result of the 2008 financial crisis. The county decided to shut down all nonessential services and furlough the affected employees for 10 days in order to save enough money to balance the budget. PERC acknowledged that the county had the right to determine and manage its own budget. But that "did not make the decision to furlough employees a permissive one."[22] The county's chief motivation for imposing the furloughs was to reduce labor costs. Unlike the Wenatchee School District case, where the respondent made a wholesale change to the scope of its operation, "this

---

[19] Griffin Sch. Dist., 2010 WL 2553112, at *6.
[20] Griffin Sch. Dist., 2010 WL 2553112, at *7.
[21] Tech. Emps. Ass'n v. King County, No. 22175-U-09-5658, 2010 WL 2553113 (Wash. Pub. Emp't Relations Comm'n).
[22] King County, 2010 WL 2553113, at *7.

16

employer's decision to close its offices does not constitute a programmatic change to any employer service."[23]

Here too, the decision to layoff the two officers was a decision to meet budget cuts by reducing labor costs. The layoffs were not related to programmatic changes, and they did not implicate Kitsap County's entrepreneurial right to control the level of service provided in the jail. The fact that the county had a legitimate need to achieve budgetary savings and had a statutory duty to manage its own budget did not make the layoff decision a permissive subject of bargaining.

The bargaining unit employees clearly had an interest in the county's decision to implement layoffs. "There is no greater possible impact on an employee than the complete loss of the employment relationship."[24] Even the county concedes that the impact of layoffs on employees was "obvious and significant." A declaration in the record details the financial, personal, and emotional impacts of these two layoffs on the officers who lost their jobs.

No one accuses the county of having an anti-union or retaliatory motive to make the layoffs. But contrary to the county's argument, that does not bring this situation back to the First National side of the spectrum. What is critical is that bargaining the layoffs would not significantly abridge the prerogative and duty of the county commissioners to adopt a budget. The predominant impact of the layoff decisions was on wages, hours, or working conditions in the bargaining

---

[23] King County, 2010 WL 2553113, at *7.
[24] Bellevue Police Support Guild, 2010 WL 3283656, at *12.

unit. The reason why such a decision must be subject to negotiation has been succinctly explained by Judge Richard Posner:

> The rule that requires an employer to negotiate with the union before changing the working conditions in the bargaining unit is intended to prevent the employer from undermining the union by taking steps which suggest to the workers that it is powerless to protect them. Of course, if the change is authorized by the collective bargaining agreement, it is not in derogation of the union and is not an unfair labor practice. But there was no agreement here. Laying off workers works a dramatic change in their working conditions (to say the least), and if the company lays them off without consulting with the union and without having agreed to procedures for layoffs in a collective bargaining agreement it sends a dramatic signal of the union's impotence.

Nat'l Labor Relations Bd. v. Advertisers Mfg. Co., 823 F.2d 1086, 1090 (7th Cir. 1987).

Corrections chief Newlin stated when announcing the layoffs that "there is no other reasonable alternative available to us." His announcement made the layoff decision a fait accompli before the Guild had the opportunity to suggest alternatives. Yet the possibility existed that bargaining with the Guild could have revealed reasonable alternatives to layoffs.

The Guild claims it could have offered various concessions, such as changes in the work schedule, furlough days for officers, or suspension of certain premium or specialty pays. A declaration from Guild president Terry Cousins confirms that the Guild was "ready and willing to explore some potential cost saving measures with the County to at least avoid one of the layoffs, if not both."

Although it is not possible to say that bargaining will necessarily result in a satisfactory solution, "national labor policy is founded upon the congressional

18

determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation." Fibreboard, 379 U.S. at 214.

In the King County furlough case, PERC commented that "no outside force compelled the employer to choose furloughs as the means by which to reduce its budget."[25] Similarly here, no outside force compelled the sheriff to reduce the jail budget by laying off members of the Guild.

The county contends there was not enough time to bargain the layoffs. The county analogizes to the time crunch faced by the school board in Spokane Educ. Ass'n, 83 Wn.2d 366. In that case, the school board had a statutory deadline for giving notices of nonrenewal to employees who were not going to be rehired for the ensuing school year. Four days before the deadline, voters rejected a special levy, necessitating a reduction in the budget. The next day, the teachers' association made a request to negotiate "'budget allocations and other policy decisions related to the reduced school program.'" Spokane Educ. Ass'n, 83 Wn.2d at 370. The school board, while willing to negotiate to explore the possibility of rehiring, nevertheless felt compelled to send out the nonrenewal notices before the looming deadline. The teacher's association unsuccessfully sought a writ to prevent the notices from being sent. Affirming, the Supreme Court took the view that the request was not made within a reasonable time. Spokane Educ. Ass'n, 83 Wn.2d at 372. The situation here was not comparable. The Guild requested to bargain the layoffs on October 25, 2011. More than two months remained before the layoffs were to occur. The record does not contain

---

[25] King County, 2010 WL 2553113, at *9.

evidence that two months was too short to engage in potentially fruitful negotiations.

The county emphasizes its statutory responsibility to finalize a balanced budget for 2012 by the end of the year. The county contends that agreeing to bargain the allocation of funds within the county budget would have presented an intolerable risk of creating a large budget deficit. Again, though, the demand was to bargain layoffs, not the budget. The county also argues there was not enough time to bargain layoffs, given the fact that interest arbitration can take months to resolve an issue bargained to impasse. This argument too must fail, as it would mean that the possibility of interest arbitration that might extend beyond the current annual budget cycle could always be used to justify a refusal to bargain over wages, hours and working conditions. When a demand to bargain about a mandatory subject arises after a budget is set, the employer does not have to agree to a specific proposal. But the employer must be willing to consider alternatives suggested by the union and potentially agree on them, even if it means an adjustment to a previously established budget amount. See City of Spokane v. Spokane Police Guild, 87 Wn.2d 457, 465, 553 P.2d 1316 (1976).

In the Griffin School District case, PERC provided guidance for public employers when faced with a budget crisis:

> Chapter 41.56 RCW does not handcuff employers from taking action in the wake of a financial crisis. Should an employer be faced with a situation where it needs to make a change to a certain mandatory subject of bargaining, it should inform the union of the issue, the importance of the issue to the employer (including the timeline in which the employer needs to complete bargaining), and, upon request, bargain in good faith. If the employer and union reach a lawful impasse, then the employer is permitted to lawfully

20

> implement its last offer on that topic, while remaining willing to bargain all other mandatory subjects of bargaining, and remain willing to return to bargaining regarding the subject of bargaining implemented by the employer if the union makes such a request.[26]

PERC's guidance is sensible. The county's assertion that bargaining the layoffs would have introduced intolerable risk into the budget process is speculation not supported by the record.

Balancing the interests, we conclude that although the county's need to achieve budgetary savings was a legitimate interest, the county's interest in the method by which the savings would be achieved was not at the core of its management prerogatives. The decision to achieve budget savings by laying off the officers was suitable for collective bargaining, and it so substantially impacted wages, hours, and working conditions in the bargaining unit that the decision was a mandatory subject of bargaining.

## WAIVER

The county argues that even if the layoffs are a mandatory subject of bargaining, the Guild waived its right to bargain over layoffs.

The collective bargaining agreement that expired in 2009 included language stating that nothing in the agreement supersedes "any matter delegated to" the Kitsap County Civil Service Commission by state law or ordinance. The civil service rules applicable to the sheriff's employees provide that layoffs made necessary by a shortage of funds will be done through seniority. "The Appointing Authority may layoff any employee . . . whenever such

---

26 <u>Griffin Sch. Dist.</u>, 2010 WL 2553112, at *10.

action is made necessary by reason of a shortage of work or funds . . . in inverse of seniority."

In the first appeal, the county argued that the Guild had waived its right to bargain layoffs by the provision in the collective bargaining agreement delegating certain matters to the civil service commission. The court did not reach the question of whether the quoted language amounted to a waiver of the right to bargain layoffs. Instead the court determined that "waivers are permissive subjects that expire with the collective bargaining agreement unless they are renewed by mutual consent." Kitsap County, 179 Wn. App. at 996. Because the agreement containing the alleged waivers had expired in 2010, the parties had not yet negotiated a new agreement, and there was no evidence at the time of the layoffs that the parties had agreed to renew the alleged waivers, the court concluded the alleged waivers expired in 2010. Kitsap County, 179 Wn. App. at 996.

The single issue on remand was for the court to conduct the balancing test. The trial court did not reconsider waiver on remand. Nevertheless, the county renews the waiver argument in the present appeal, with this addition: that the civil service rules govern layoffs regardless of what was in the collective bargaining agreement.

To a great extent, the county's argument is barred by the law of the case doctrine. The law of the case doctrine stands for the proposition that once there is an appellate holding enunciating a principle of law, that holding will be followed in subsequent stages of the same litigation. The doctrine seeks to promote

22

finality and efficiency in the judicial process. Roberson v. Perez, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). The law of the case doctrine is discretionary, not mandatory. Subsequent appellate reconsideration of an identical issue will be granted only where the holding of the prior appeal is clearly erroneous and application of the doctrine would result in manifest injustice. Folsom v. County of Spokane, 111 Wn.2d 256, 759 P.2d 1196 (1988); see also RAP 2.5(c)(2). The holding in the first appeal—that a waiver expires when the agreement expires—is not clearly erroneous. And the county does not persuasively demonstrate that reconsidering that holding is necessary to avoid a manifest injustice.

To the extent that the first appeal leaves room for the county to argue that the civil service rules preclude bargaining over layoffs, we reject the argument. A waiver of a right to bargain must be clear, unmistakable, and knowingly made, and it must specifically address the subject upon which the waiver is claimed. Kitsap County, 179 Wn. App. at 995. By this standard, we cannot say that the prior collective bargaining agreement included a waiver of the right to bargain layoffs by its reference to the civil service rules.

## REMEDY

The trial court provided declaratory relief only. The county contends a declaratory order suffices to clarify the parties' bargaining obligations. PERC and the Guild ask for a more detailed remedial order.

Under the act, PERC has the authority to issue "appropriate remedial orders." RCW 41.56.160(1). The act is to be liberally construed to accomplish its purpose. Mun. of Metro. Seattle v. Pub. Emp't Relations Comm'n, 118 Wn.2d

23

621, 633, 826 P.2d 158 (1992). The purpose of the act "is to provide public employees with the right to join and be represented by labor organizations of their own choosing, and to provide for a uniform basis for implementing that right." City of Yakima v. Int'l Ass'n of Fire Fighters, AFL-CIO Local 469, 117 Wn.2d 655, 670, 818 P.2d 1076 (1991), quoted in Mun. of Metro. Seattle, 118 Wn.2d at 633. With that purpose in mind, the Supreme Court has interpreted the statutory phrase "appropriate remedial orders" to be those necessary to effectuate the purposes of the collective bargaining statute and to make PERC's lawful orders effective. Mun. of Metro. Seattle, 118 Wn.2d at 633.

Considering that the purpose of the act is to provide "a uniform basis" for implementing the right of collective bargaining, we hold that the court has the same authority and obligation as PERC to issue an appropriate remedial order. If PERC determines that any person has engaged in an unfair labor practice, a cease and desist order is appropriate, and PERC may also take affirmative action such as ordering the payment of damages and the reinstatement of employees. RCW 41.56.160(2). PERC's authority to fashion a remedy that suits the case is broad. Mun. of Metro. Seattle, 118 Wn.2d at 633.

The situation in the present case is clear-cut: either the county committed an unfair labor practice by refusing to bargain the layoffs, or the Guild committed an unfair labor practice by insisting on the right to bargain to impasse. Because we conclude that the layoff decision was a mandatory subject of bargaining, it follows that the county is the party who committed an unfair labor practice and that an appropriate remedial order should be entered. We remand for the trial

24

court to decide what directives to include in the order. The court should consider PERC's precedent and practice in the matter of remedies. See Mun. of Metro. Seattle, 118 Wn.2d at 634 (recognizing PERC's expertise in the relation of remedy to policy). The trial court may also consider on remand the Guild's arguments for an award of attorney fees.

We reverse and remand for entry of judgment in favor of the Guild and an appropriate remedial order.

Becker, J.

WE CONCUR:

Leach, J.

Dwyer, J.