IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CITY OF EVERETT, | ) | No. 77831-5-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON PUBLIC EMPLOYMENT RELATIONS COMMISSION and INTERNATIONAL ASSOCATION OF FIRE FIGHTERS, LOCAL 46, | ) | PUBLISHED OPINION |
| | ) | |
| Respondents. | ) | FILED: October 28, 2019 |

SCHINDLER, J. — A public employer and a union representing public employees have a duty to bargain in good faith on mandatory subjects of collective bargaining. It is an unfair labor practice to insist on bargaining to impasse a nonmandatory subject of collective bargaining. During negotiations between the city of Everett (City) and the International Association of Fire Fighters Local 46 (Union) on a successor collective bargaining agreement, the Union proposed an amendment to "Article 27, Health and Safety," to increase the minimum crew level of firefighters and paramedics on duty for a 24-hour shift. As a general rule, the determination of shift staffing is a fundamental and strong management prerogative that is a nonmandatory subject of bargaining. The City filed an unfair labor practice complaint against the Union, alleging the Union insisted on

bargaining to impasse the proposal to amend Article 27. The Washington State Public Employment Relations Commission (PERC) balanced the City's managerial prerogative over shift staffing with unrebutted evidence submitted by the Union that demonstrated a direct relationship between the proposed amendment and the workload and safety of the firefighters and paramedics. PERC concluded the proposed amendment to Article 27 was a mandatory subject of bargaining. The City appeals the PERC decision to dismiss the unfair labor practice complaint.[1] The City cites International Ass'n of Fire Fighters, Local Union 1052 v. Public Employment Relations Commission, 113 Wn.2d 197, 778 P.2d 32 (1989), to assert that without regard to workload and safety concerns, as a matter of law shift staffing is never a mandatory subject of collective bargaining. We disagree. In International Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 204, the Washington State Supreme Court expressly rejected the assertion that the determination of shift staffing "never can be 'working conditions' included within the scope of mandatory bargaining." While "staffing levels typically weigh on the managerial prerogative side of the balance," where there is "a demonstratedly direct relationship" to workload and safety, shift staffing may be a mandatory subject of collective bargaining. Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 207, 204. The court held, "Every case presents unique circumstances, in which the relative strengths of the public employer's need for managerial control on the one hand, and the

---

[1] The Washington State Association of Municipal Attorneys filed an amicus curiae brief on behalf of the City. The Washington State Council of Fire Fighters filed an amicus curiae brief on behalf of the Union. We reject the argument that under RAP 10.3(a)(8) and RAP 10.4(c), the Washington State Association of Municipal Attorneys is entitled to submit new evidence as appendices. The City filed a motion to strike "various studies" and other new evidence referred to in the Amicus Curiae Washington State Council of Fire Fighters' brief "regarding risk" to firefighters. Because PERC did not consider the evidence presented by Amicus Curiae Washington State Council of Fire Fighters, we disregard the new information. See Tapper v. Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993) (judicial review is confined to the record before the agency).

employees' concern with working conditions on the other, will vary," and PERC must carefully consider "meaningful distinctions in the circumstances" of each case. Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 207. Even if shift staffing is not a per se mandatory subject of collective bargaining, the City contends PERC erred in balancing the interests, and substantial evidence does not support finding a direct relationship between shift staffing and workload and safety. We conclude PERC did not err in balancing the strong fundamental prerogative of the City on shift staffing and the unrebutted workload and safety testimony, and substantial evidence supports PERC finding the Union demonstrated a direct relationship between the Union proposal to increase the minimum number of crew on each shift and the workload and safety of the firefighters and paramedics. We affirm the PERC decision.

## City of Everett Fire Department

The Everett Fire Department operates six stations and responds to residential and commercial building fires, fires at the Navy shipyard, medical emergencies, and emergencies on Interstate 5.

The International Association of Fire Fighters Local 46 (Union) represents firefighters, paramedics, captains, and battalion and assistant chiefs.

## Article 27, Health and Safety

In 1974, the city of Everett (City) and the Union agreed to include "Article XXVII, Health and Safety Measures," in the collective bargaining agreement. Article XXVII established a minimum number of firefighters on duty for each shift.

In 1976, the City and Union reached an impasse on negotiating a successor collective bargaining agreement. The City filed a declaratory judgment action. The City

challenged the Public Employees' Collective Bargaining Act (PECBA)[2] statutes, RCW 45.56.100 and .450, that impose mandatory mediation and interest arbitration on mandatory subjects of collective bargaining.[3] The City also sought a declaratory judgment on whether a minimum crew for each shift was a mandatory subject of bargaining. In City of Everett v. Fire Fighters, Local No. 350 of the International Ass'n of Fire Fighters, 87 Wn.2d 572, 555 P.2d 418 (1976), the Washington Supreme Court rejected the City's challenge to the statutes that require mediation and interest arbitration. Because the court affirmed the order to engage in interest arbitration, the court declined to address whether minimum crew requirements is a mandatory subject of bargaining. However, the court noted, "It would appear that the size of the crew might well affect the safety of the employees and would therefore constitute a working condition, within the meaning of RCW 41.56.030(4) defining collective bargaining." City of Everett, 87 Wn.2d at 576.

On remand, the arbitration panel concluded minimum on-duty crew staffing for each shift related to the safety of the firefighters and was a mandatory subject of bargaining. With minor changes, the 1976 collective bargaining agreement and subsequent collective bargaining agreements have included "Article 27, Health and Safety."

Article 27, Health and Safety, states:

> The parties recognize that manning (crew size, on duty shift force) vitally affects the efficient and economic operation of the Department in providing the best possible service to the community and, further, that changes from the present minimum level agreed to in prior contracts do affect the safety and job security of the members of the Union, and therefore agree as

---

[2] RCW 41.56.010 through .900, RCW 41.06.150.

[3] See LAWS OF 1975, 1st Ex. Sess., ch. 296, §§ 21, 29.

follows:

> The City agrees to maintain a firefighting force of at least twenty-five (25) firefighters on duty at all times. The City further agrees to maintain at least three (3) firefighters on each fire suppression company, one of whom shall be a captain; to maintain two (2) firefighters on each aid car and to maintain a battalion chief who shall be on duty with each fire suppression platoon.

> The City further agrees to use the attrition method in reaching the twenty-five (25) firefighter minimum crew level. Attrition is defined as voluntary quit, dismissal for just and sufficient cause, permanent disability, retirement or death.

> Provided, however, that notwithstanding the foregoing, the City may, during the course of the contract year, seek to effect a change in the minimum manning provided by paragraph one above. If the City desires to effect such change, it shall propose to the Union a written proposal as to the reduction sought including reason for the change, prior to the date of the change.

## 2012-2014 Successor Agreement Negotiation

In 2008, the City imposed a zero-growth budget for the fire department. In 2010, the City reduced the minimum crew on duty for each shift from 33 to 28. However, the City "neither reduced the number of personnel assigned to an apparatus nor changed the number and type of apparatuses required to respond to calls." For a medical emergency, "a minimum of seven people on an engine, a paramedic unit, and, possibly, an aid unit" are required to respond. If no aid unit is available, "a second engine responds." For a residential fire, "a minimum of 17 personnel respond." For a commercial fire, "a minimum of 21 personnel respond."

In 2014, the population and size of the City had grown to 104,900 citizens with an area of 34.16 square miles, and the number of calls to the fire department had increased to 21,389.

In 2014, the City and the Union engaged in negotiations for a successor collective bargaining agreement. In response to the significant increase in workload and safety concerns, the Union proposed an amendment to Article 27 to increase the minimum crew on duty for each shift to 35. The proposed amendment to Article 27, Health and Safety, provides:

> The parties recognize that manning (crew size, on duty shift force) vitally affects the efficient and economic operation of the Department in providing the best possible service to the community and, further, that changes from the present minimum level agreed to in prior contracts do affect the safety and job security of the members of the Union, and therefore agree as follows:
>
> The City agrees to maintain a firefighting force of at least twenty-five (25) thirty five (35) firefighters on duty at all times. The City further agrees to maintain at least three (3) firefighters on each fire suppression company, one of whom shall be a captain; to maintain two (2) firefighters on each aid car and to maintain a battalion chief who shall be on duty with each fire suppression platoon.
>
> The City further agrees to use the attrition method in reaching the twenty five (25) thirty five (35) firefighter minimum crew level. Attrition is defined as voluntary quit, dismissal for just and sufficient cause, permanent disability, retirement or death.
>
> Provided, however, that notwithstanding the foregoing, the City may, during the course of the contract year, seek to effect a change in the minimum manning provided by paragraph one above. If the City desires to effect such change, it shall propose to the Union a written proposal as to the reduction sought including reason for the change, prior to the date of the change.[4]

The City objected to the Union proposal to increase the minimum crew on duty for each shift to 35. In a memorandum dated March 16, 2015, the City cited International Ass'n of Fire Fighters, Local Union 1052 v. Public Employment Relations Commission, 113 Wn.2d 197, 778 P.2d 32 (1989), to assert the Union proposal was a "permissive—not mandatory" subject of collective bargaining. The Union disagreed and

---

4 Alterations in original; emphasis in original.

insisted on bargaining the proposed amendment to impasse. The Washington State Public Employment Relations Commission (PERC) executive director certified the issue for resolution by mediation and, if necessary, interest arbitration.[5]

Unfair Labor Practice Complaint

The City filed an unfair labor practice complaint with PERC. The City alleged the Union violated the PECBA "by insisting to impasse on a permissive subject, namely, shift staffing." The City alleged the Union proposal for "shift staffing, or 'minimum crew level,' of 'thirty-five (35) firefighters on duty at all times,' " is a nonmandatory subject of bargaining under Washington case law. The City requested PERC issue a cease and desist order and award attorney fees.

The Union filed an answer and affirmative defenses. The Union alleged the amendment to Article 27 is a "mandatory subject of bargaining because shift staffing, given the facts, directly relates to work load of unit personnel and the health and safety of the unit personnel." The Union cited International Ass'n of Fire Fighters, Local Union 1052 to assert Article 27, Health and Safety, is a mandatory subject of bargaining because "staff levels under the facts of this case have a demonstrably direct relationship to employee workload and safety." The Union alleged, "While the call volume for the City of Everett Fire Department has increased dramatically, the number of personnel available to respond to the call volume has decreased over time," resulting in health and safety concerns for the firefighters and paramedics. The Union requested PERC to order the City to engage in mediation and, if necessary, interest arbitration and award attorney fees.

---

[5] The letter of certification notes, "The employer has claimed, and notified the union during mediation, that this issue is a permissive subject of bargaining."

PERC Hearing Examiner Decision

A hearing examiner conducted a four-day evidentiary hearing on the unfair labor practice complaint. Several witnesses testified, including Everett Fire Department Chief Murray Gordon, Everett Fire Department Administrative Coordinator Bonnie Netherby, division and battalion chiefs, Oregon Health and Science University Sports Medicine Chief and Human Performance Laboratory Director Dr. Kerry Kuehl, and occupational and environmental medicine expert Dr. Carl Brodkin. The hearing examiner admitted more than 100 exhibits into evidence.

The hearing examiner rejected the City's argument that because shift staffing is a core managerial prerogative "solely within the province of managerial prerogative," there is "no need" to balance the City's managerial prerogative and the firefighters' concerns regarding workload and safety. The decision and order states, in pertinent part:

> This case is not about the employer's right to determine its mission or set the scope of services it provides its citizens. Instead, it relates to how shift staffing levels that are set by the employer to provide those services impact firefighter safety. The union's proposal does not require the employer to reduce, increase, or eliminate the level of firefighting services it provides to its citizens.
>
> . . . .
>
> This case presents employee interests regarding workload and safety issues related to shift staffing levels. The validity of those interests have been acknowledged by the courts and Commission for forty years, including twice by the Washington State Supreme Court, where the court stated that the issue of shift staffing of firefighters "might well affect the safety of [the] employees and would therefore constitute a working condition." City of Everett, 87 Wn.2d [at 576]; [Int'l Ass'n of Fire Fighters, Local Union 1052], 113 Wn.2d 197 (1989). When a subject touches on both employee interests in wages, hours, and working conditions and management prerogatives, those interests must be balanced.

The hearing examiner balanced the managerial prerogative of the City to decide shift staffing levels and the workload and safety interests of the Union. The hearing examiner concluded the Union "did not show a 'demonstratedly direct' relationship between cited safety interests and shift staffing levels to shift the balance in the union's favor to make the shift staffing proposal at issue here a mandatory subject of bargaining." The hearing examiner entered findings of fact, conclusions of law, and an order requiring the Union to cease and desist from bargaining the shift staffing proposal to impasse and seeking arbitration on the amendment to Article 27.

PERC Decision

The Union appealed the decision of the hearing examiner to PERC. The Union argued the hearing examiner ignored the "unrebutted testimony" that established a direct relationship between increased call volume and "the health impacts" to the firefighters and paramedics. The Union cited testimony showing the "direct impact call volume . . . has on workload, working conditions, health and safety of these Union employees." In response, the City argued the Union did not establish "staffing at 28 creates unsafe conditions" and the Union did not present evidence "to tie their concerns to specific staffing levels."

PERC reversed the decision of the hearing examiner. PERC adopted findings of fact 1 through 5 and findings of fact 7 through 17 from the hearing examiner decision and entered findings of fact 6, 18, and 19. PERC found the Union "met its burden to prove that staffing impacted workload and safety." PERC found, "The employees' interests in workload and safety outweighs the employer's right to determine the number of firefighters assigned to each 24-hour shift." PERC concluded the Union proposal to

amend Article 27 to increase the minimum crew on duty for each shift was a mandatory subject of bargaining.[6]

Petition For Judicial Review

The City filed a petition for judicial review. The superior court certified the petition for direct review. We accepted review under RCW 34.05.518(2).

The Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, governs our review of the PERC decision. RCW 41.56.165; Pasco Police Officers' Ass'n v. City of Pasco, 132 Wn.2d 450, 458, 938 P.2d 827 (1997). Under WAPA, judicial review is limited to the record before the agency, and "the burden of demonstrating the invalidity of the agency action rests with the party asserting invalidity." Puget Soundkeeper All. v. Dep't of Ecology, 191 Wn.2d 631, 637, 424 P.3d 1173 (2018); RCW 34.05.558, .570(1)(a); Tapper v. Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

The City alleges the PERC decision and order dismissing the unfair labor practice complaint exceeds the statutory authority of the agency under RCW 34.05.570(3)(b), PERC erroneously interpreted and applied the law under RCW 34.05.570(3)(d), substantial evidence does not support the decision under RCW 34.05.570(3)(e), and the decision is arbitrary or capricious under RCW 34.05.570(3)(i).[7]

In reviewing the PERC decision and order, we sit "in the same position as the superior court, applying the standards of the WAPA directly to the record before the

---

[6] The PERC decision states it did not consider whether the parties previously "agreed to include a subject in a collective bargaining agreement" in deciding whether the proposed amendment to Article 27 was a mandatory subject of collective bargaining.

[7] PERC filed a brief. The City argues we should disregard arguments PERC makes on the merits. While the role of PERC on appeal is limited, we consider the arguments that are in response to the City's assertion that PERC acted outside its statutory authority or erroneously interpreted and applied the PECBA. See Kaiser Alum. & Chem. Corp. v. Dep't of Labor & Indus., 121 Wn.2d 776, 782, 854 P.2d 611 (1993).

agency." Tapper, 122 Wn.2d at 402. Because PERC is entitled to substitute its findings for those of the hearing examiner, we review only the PERC decision on appeal. RCW 34.05.464(4); Yakima County v. Yakima County Law Enf't Officers' Guild, 174 Wn. App. 171, 180, 297 P.3d 745 (2013); Yakima Police Patrolmen's Ass'n v. City of Yakima, 153 Wn. App. 541, 552, 222 P.3d 1217 (2009).

Under the error of law standard, we may substitute our interpretation of the law. Pasco Police, 132 Wn.2d at 458. However, we give "due deference" to an administrative agency on matters falling within its area of expertise. Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 595, 90 P.3d 659 (2004). The substantial evidence standard is deferential; we do not substitute our view of the facts for that of the agency if substantial evidence is found. Yakima Police, 153 Wn. App. at 553. We may grant relief from an agency decision and order if substantial evidence does not support the findings " 'when viewed in light of the whole record.' " Pasco Police, 132 Wn.2d at 458 (quoting RCW 34.05.570(3)(e)). Substantial evidence is " 'evidence sufficient to persuade a fair-minded person of the[ ] truth.' " Yakima Police, 153 Wn. App. at 552-53 (quoting City of Federal Way v. Pub. Emp't Relations Comm'n, 93 Wn. App. 509, 512, 970 P.2d 752 (1998)). Unchallenged factual findings are verities on appeal. City of Vancouver v. Pub. Emp't Relations Comm'n, 180 Wn. App. 333, 347, 325 P.3d 213 (2014).

### Mandatory v. Permissive Subject of Collective Bargaining

The PECBA defines "collective bargaining" as

the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on personnel

matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such public employer, except that by such obligation neither party shall be compelled to agree to a proposal or be required to make a concession unless otherwise provided in this chapter.

RCW 41.56.030(4).[8]

Washington law distinguishes between mandatory and permissive subjects of collective bargaining. As defined in RCW 41.56.030(4), "personnel matters, including wages, hours and working conditions," are mandatory subjects of collective bargaining. "[I]ssues that address 'wages, hours and other terms and conditions of employment' are 'mandatory' subjects about which the parties must bargain." Pasco Police, 132 Wn.2d at 460[9] (quoting Klauder v. San Juan County Deputy Sheriffs' Guild, 107 Wn.2d 338, 341, 728 P.2d 1044 (1986)). By contrast, "[m]anagerial decisions that only remotely affect 'personnel matters' " and employer "decisions that are predominantly 'managerial prerogatives' " are nonmandatory or permissive subjects of collective bargaining. International Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 200.

The parties must bargain in good faith "on mandatory subjects" of collective bargaining. RCW 41.56.030(4); Kitsap County v. Kitsap County Corr. Officers' Guild, Inc., 193 Wn. App. 40, 45, 372 P.3d 769 (2016). If the parties reach an impasse on a mandatory subject, the dispute is resolved through interest arbitration. Pasco Police, 132 Wn.2d at 460-61. The parties may bargain on nonmandatory or permissive subjects of collective bargaining but are not required to do so. Klauder, 107 Wn.2d at 342-43; Kitsap County, 193 Wn. App. at 45. It is an unfair labor practice to refuse to

---

[8] We note the legislature has amended RCW 41.56.030 several times since 2012. LAWS OF 2015, 2d Spec. Sess., ch. 6, § 1; LAWS OF 2017, 3d Spec. Sess., ch. 6, § 808; LAWS OF 2018, ch. 253, § 6; LAWS OF 2019, ch. 280, § 1. None of the amendments changed the definition of "collective bargaining."

[9] Emphasis in original.

engage in bargaining on a mandatory subject to impasse or to insist on bargaining a nonmandatory subject to impasse. RCW 41.56.140, .150; Kitsap County, 193 Wn. App. at 47.

A fundamental responsibility of PERC is to determine the scope of mandatory bargaining under the PECBA. Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203. WAC 391-45-550 governs that determination:

> The commission deems the determination as to whether a particular subject is mandatory or nonmandatory to be a question of law and fact to be determined by the commission, and which is not subject to waiver by the parties or their action or inaction. It is the policy of the commission that a party which engages in collective bargaining with respect to a particular issue does not and cannot confer the status of a mandatory subject on a nonmandatory subject.

Whether Shift Staffing is Never a Subject of Mandatory Collective Bargaining

The City contends PERC erroneously interpreted and applied the law by deciding that the shift staffing amendment both relates to conditions of employment and is a fundamental managerial prerogative. The City cites International Ass'n of Fire Fighters, Local Union 1052 to claim that without regard to workload and safety concerns, as a matter of law shift staffing is a "fundamental prerogative of management" that is never a mandatory subject of collective bargaining.

In International Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 198-99, the union proposed including a " 'Standards of Safety' " provision in the collective bargaining agreement to address the " 'number and type of apparatus and the number and rank of personnel responding to alarms.' " The city of Richland filed an unfair labor practice complaint, alleging the union insisted on negotiating a nonmandatory subject of bargaining to impasse. Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at

198-99. PERC concluded that because "equipment staffing 'has previously been held to be a permissive subject of bargaining,' " the union committed an unfair labor practice by bargaining a nonmandatory subject to impasse. Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 202 (quoting City of Richland v. Int'l Ass'n of Fire Fighters, Local 1052, No. 6289-U-86-1214, 1987 WL 383145, at *2 (Wash. Pub. Emp't Comm'n July 31, 1987)).

The Washington Supreme Court reversed. The court concluded PERC "abdicated its fundamental responsibility to determine the scope of mandatory bargaining under the public employment collective bargaining laws." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203. Contrary to determining the scope of bargaining based on the facts of the case, PERC assumed but did not decide the dispositive issue of "whether Local 1052's proposal regarding equipment staffing and deployment concerns a mandatory subject of bargaining." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 202.

The Supreme Court expressly rejected the claim that "staffing level decisions, whatever their relationship to workload and safety, never can be 'working conditions' included within the scope of mandatory bargaining." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 204. The court held that

> [w]hen staffing levels have a demonstratedly direct relationship to employee workload and safety, however, we believe that, under appropriate circumstances, requiring an employer to bargain over them will achieve the balance of public, employer and union interests that best furthers the purposes of public employment collective bargaining laws.

Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 204.[10] The court expressly

---

[10] Emphasis added.

states, "We have said as much before" and cites the decision in City of Everett:

> In [City of Everett], we deferred to arbitration the question of whether a fire fighter union's minimum shift proposal was a mandatory subject of bargaining, noting that
> the size of the crew might well affect the safety of the employees and would therefore constitute a working condition, within the meaning of RCW 41.56.030(4) defining collective bargaining.

Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 204 (quoting City of Everett, 87 Wn.2d at 576).

The court held that where a subject of collective bargaining relates to working conditions and a managerial prerogative, the scope of bargaining is determined on a case-by-case basis by a "balancing approach." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203. The court states workload and safety issues that concern "wages, hours and working conditions" is a mandatory subject of collective bargaining, while staffing level decisions are a strong and fundamental managerial prerogative. Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203, 205. "On one side of the balance is the relationship the subject bears to 'wages, hours and working conditions'. On the other side is the extent to which the subject lies 'at the core of entrepreneurial control' or is a management prerogative." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203[11] (quoting RCW 41.56.030(4); Spokane Educ. Ass'n v. Barnes, 83 Wn.2d 366, 376, 517 P.2d 1362 (1974)). "Where a subject both relates to conditions of employment and is a managerial prerogative, the focus of inquiry is to determine which of these characteristics predominates." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203.

---

[11] Internal quotation marks omitted.

The court emphasized, "The law is clear that general staffing levels are fundamental prerogatives of management." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 205. For example, " '[w]hether a community will have a large police force, a small one, or none at all, is a very basic managerial decision which ultimately must be determined by the voting public through its elected representatives.' " Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 205 (quoting City of Yakima v. Yakima Police Patrolman's Ass'n, No. 2427-U-79-351, 1981 WL 376896, at *3 (Wash. Pub. Emp't Relations Comm'n Apr. 8, 1981)); see also Kitsap County, 193 Wn. App. at 53.

The court states that "[c]ompared with shift staffing, . . . equipment staffing is not so importantly reserved to the prerogative of management." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 206.

> The distinction often has been noted in the case law. In the Yakima Police[12] case, for example, where a shift staffing proposal was held to be a nonmandatory subject of bargaining, the examiner carefully avoided suggesting any conclusions about equipment staffing

Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 206. But the court held that while the managerial prerogative to decide staffing levels strongly weighs in favor of the employer, PERC must carefully analyze the circumstances in each case and whether there is also a demonstrably direct relationship to workload and safety working conditions:

> Every case presents unique circumstances, in which the relative strengths of the public employer's need for managerial control on the one hand, and the employees' concern with working conditions on the other, will vary. General understandings—such as an understanding that staffing levels typically weigh on the managerial prerogative side of the balance of employer and union interests—may, of course, inform PERC's analysis.

---

[12] City of Yakima, No. 2427-U-79-351.

16

But care must be taken to recognize meaningful distinctions in the circumstances of different cases.

Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 207.

We hold the Washington State Supreme Court decision in International Ass'n of Fire Fighters, Local Union 1052 does not support the City's argument that without regard to workload and safety, as a matter of law shift staffing is never a mandatory subject of collective bargaining. Because the Union proposal to amend Article 27, Health and Safety, to increase the minimum number of firefighters and paramedics on duty for each shift both relates to "conditions of employment and is a managerial prerogative," PERC did not err in balancing the City and Union interests to determine "which of these characteristics predominates." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203.

## Application of the Balancing Test

In the alternative, the City contends PERC erred in applying the balancing test by not considering the fundamental management prerogative of the City to make shift staffing decisions, improperly considering the public interest as a factor, and disregarding the evidence the City presented on the budget and the cost of the proposed amendment to Article 27.

### Managerial Prerogative

Contrary to the City's argument, PERC considered the City's "strong managerial prerogative" to set shift staffing levels. The unchallenged findings state:

> The employer has a strong managerial prerogative in being able to determine shift staffing levels. This prerogative has long been acknowledged by the Commission and courts. This is consistent with the fact that employers are tasked with determining their mission, setting service levels, and budgeting to provide those services.

PERC considered "the employer's interest in determining the size of its workforce, the union's interests in workload and safety, and the public's interest in receiving effective services." PERC recognized that "[s]hift staffing is generally a permissive subject of bargaining" but concluded the Union presented "compelling evidence" that the firefighters' "interests in workload and safety outweighs the employer's right to determine the number of firefighters assigned to each 24-shift." However, PERC notes:

> By finding the union's proposal in this instance to be a mandatory subject of bargaining, we are not finding that a proposal on minimum staffing would be a mandatory subject of bargaining every time the parties negotiate. Each round of bargaining would present facts for analysis. While this does not provide parties with certainty about what topics are mandatory subjects of bargaining, it does effectuate the appropriate balance.

### Public Interest

The City and Amicus Curiae Washington State Association of Municipal Attorneys contend PERC erred as a matter of law in considering the public interest in determining whether workload and safety outweighed the fundamental managerial prerogative to decide shift staffing. PERC found that "[i]ncreases in the number of calls responded to each shift directly impact firefighters' safety and the safety of the public they serve." PERC concluded, in pertinent part:

> In most cases, the Commission has recognized that the public acts through its elected representatives. City of Yakima, [No. 2427-U-79-351]. However, in a case such as this, the public's interest in safety must be weighed. [Int'l Ass'n of Fire Fighters, Local Union 1052], 113 Wn.2d at 204. The public places its trust and safety in the hands of professional firefighters and paramedics. The public has a strong interest in receiving assistance from a firefighter that is not physically, emotionally, or psychologically fatigued from the effects of responding to 10 to 16 calls per shift. Each call may have a different physical, emotional, or

18

psychological toll on a firefighter. It is in the public's best interest that firefighters are able to respond in the best possible frame of mind so that they make sound decisions and move safely in high-risk situations.[13]

PERC did not err in considering the public interest. In International Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 203, the Washington Supreme Court states the legislature "delegated to PERC the delicate task of accommodating the diverse public, employer and union interests at stake in public employment relations." The court concluded that requiring an employer to bargain over staffing levels "under appropriate circumstances . . . will achieve the balance of public, employer and union interests that best furthers the purposes of the public employment collective bargaining laws." Int'l Ass'n of Fire Fighters, Local Union 1052, 113 Wn.2d at 204.[14]

### Cost Evidence

The City contends PERC erred in disregarding evidence of the cost of the Union proposal to increase the minimum crew on duty for each shift. The City asserts the exclusion of the evidence was arbitrary and capricious. An arbitrary and capricious action is a " 'willful and unreasoning action, without consideration and in disregard of facts and circumstances.' " Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 110 Wn. App. 498, 515, 41 P.3d 1212 (2002) (quoting Pierce County Sheriff v. Civil Serv. Comm'n for Sheriff's Emps. of Pierce County, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)).

PERC did not consider evidence that the City presented on the cost of the Union proposal because the City provided specific cost information for the first time at the

---

13 Emphasis added.
14 Emphasis added.

hearing:

> While the employer communicated to the union that the union's proposal
> was expensive, the employer did not tell the union that the employer could
> not afford the proposal. However, the employer introduced evidence at
> hearing about the cost of the union's proposal. Employer Exhibits 22 and
> 23 showed the cost to pay a firefighter. Arguments raised only at hearing
> and not presented to the other party during negotiations should not be
> allowed to form the basis of a party's argument that a proposal is or is not
> a mandatory subject of bargaining. See [Int'l Ass'n of Fire Fighters, Local
> 29 v. ]City of Spokane, [No. 9648-U-92-2177] ([Wash. Pub. Emp't
> Relations Comm'n June 23,] 1994).

The decision not to consider the cost evidence was not arbitrary or capricious.

The record supports PERC finding the City did not present specific cost information until

the hearing. "[C]ollective bargaining includes the duty to provide relevant information" to

the other party. City of Bellevue v. Int'l Ass'n of Fire Fighters, Local 1604, 119 Wn.2d

373, 383, 831 P.2d 738 (1992) (citing Nat'l Labor Relations Bd. v. Truitt Mfg. Co., 351

U.S. 149, 152-53, 76 S. Ct. 753, 100 L. Ed. 1027 (1956) (good faith bargaining requires

a party asserting an "inability to pay" to present "some sort of proof of its accuracy").

PERC did not err in disregarding the cost evidence the City presented for the first time

at the hearing.[15]

### Findings of Fact on Increased Workload and Safety

The City contends substantial evidence does not support a portion of finding of

fact 18 and finding of fact 19. The City challenges the following underlined portion of

finding of fact 18:

> Firefighting is an inherently dangerous, high-stress profession that impacts
> firefighter health and safety through exposure to chemicals or bodily fluids,
> ill or injured individuals, and fires. Increases in the number of calls

---

[15] For the first time on appeal, the City cites chapter 35.33 RCW to argue PERC "acted outside its statutory authority" by impinging on the City's obligation to adopt a balanced budget. As the Union points out in a supplemental brief, the City can present evidence on cost and the ability to pay at the mediation and interest arbitration.

responded to each shift directly impact firefighters' safety and the safety of the public they serve. As the number of calls increase throughout a shift, firefighters' mental and physical readiness for the next call are adversely impacted. Fatigue directly impacts safety.

Finding of fact 19 states, "The union established that staffing had a demonstratedly direct relationship to firefighter workload and safety."

Unchallenged findings of fact and unrebutted testimony establish a dramatic increase in the volume of calls to the fire department with no increase in the number of firefighters and paramedics to respond to the calls.

> The City of Everett has grown over the decades. In 1978, the population was 52,000 in an area of 22.68 square miles. There were 4,980 calls for service and the fire department was staffed with a minimum of 26 firefighters per shift. In 2014, the population was 104,900 in an area of 34.16 square miles. There were 21,389 calls for service and the department was staffed with a minimum of 28 firefighters per shift.
>
> A 2007 "needs assessment" for the fire department concluded:
>
> "[W]hen an engine company responds to 10 or more alarms per day, they are considered to be 'ineffective' for all subsequent responses or additional duties, such as training or inspections." The needs assessment identified the national standard of "effective" responses as less than 10 calls per day.

A comparison of "the number of dispatches per unit" based on the City's 2012 annual report showed "a decrease in the minimum number of firefighters on duty and the increase in call volume resulted in firefighters responding to more calls throughout their shifts."

Captain Sebastian Sittig prepared a "statistical analysis of the number of calls that Everett responds to" and "the number of calls their comparable departments" responded to in 2014. Captain Sittig used a metric for "the total number of calls versus the total minimum staffing" to show "how many calls each minimum staff is responsible

21

for . . . responding to." Captain Sittig testified that in 2014, Everett firefighters responded to "over 1,000 calls . . . per year" and the "vast majority" of other local departments "are below 600."

The City contends the evidence the Union presented does not support finding a direct relationship between increased workload and firefighter safety. We disagree. RCW 34.05.461(4) supports the decision to reject the City's characterization of the testimony of the division and battalion chiefs as anecdotal evidence that could not establish a direct relationship between workload and safety. PERC found:

> The battalion chiefs were in the best position to testify about the level of fatigue they had observed among their staff. Such observations are the type of evidence that reasonably prudent persons would rely on. Further, the employer did not rebut the battalion chiefs' testimony.

The unrebutted testimony of the fire department chiefs and captains supports PERC finding a demonstrably direct relationship between workload and safety. The testimony established the increased demand to respond to calls resulted in safety risks to the crews on duty for each shift.

Battalion chiefs are shift commanders. Battalion Chief Roger Westlund testified that response time is critical, but due to the increase in call volume, "there will be delayed responses because rigs far away" will have to respond. Chief Westlund testified the increased response time creates an "increased risk." Division Chief John Gage also testified that the increased demand of 10 to 12 calls each day caused a delayed response. Chief Gage testified there was a correlation "between delayed response time and safety to the firefighter." Chief Gage described the safety protocol of "two-in, two-out." The protocol requires a firefighter crew to wait to enter a burning building until "another crew" is available to "come in and rescue us or back us up."

Chief Gage testified the unavailability of units and crew to respond to increased call demand means crew members "may have to do the work of two or three people while you wait for that other unit to get there because they are delayed." Chief Gage testified it was necessary to order crew members "to work more than 24 hours because of shortages that we have." Chief Gage said, "[W]e have seen an increase in the number of . . . on-the-job injuries." Chief Gage said the "illnesses, the sick leave" is "starting to trend back upwards" and "is in direct relation" to the increase in call volume.

Captain Michael Lande testified that his engine company averaged "10 to 15" calls a day. Captain Lande said that in his last three shifts, "we've been running about 14, 15, 16 calls" each shift. Captain Lande said that "if" he slept during those shifts, "it was probably for a half an hour." Captain Lande explained that decontamination and cleaning the equipment is "critical." Captain Lande testified that on at least two occasions, the crew did not have time to clean and decontaminate the fire truck before responding to another call. Captain Lande testified he "had to sacrifice our health" in order to respond to the next call.

Battalion Chief Jeffrey Edmonds testified that the increase in call volume prevents firefighters from training and performing inspections. Chief Edmonds said training "is not occurring" and a firefighter "can't be a 911 responder without appropriate training." The firefighters "don't have time" to train or "practice rescues" and delayed or inadequate training is a "risk to the safety to the firefighters and the paramedics." Chief Murray Gordon agreed that "not getting all the training in as is requested or normal because of a lack of time" would "compromise to some extent the preparedness of the firefighter . . . [t]o provide service."

23

Chief Edmonds testified that the increased "call volume" increased the workload "for everybody" on duty:

> If an apparatus is on a call, they're obviously out of service and unable to respond to another call in their area. So that leaves other rigs to jump that and move in. So if there's a call in this area, which I've had, and no rigs are available that have — assigned to this area, another apparatus has to come out. So it increases everybody's workload around the city. Not just the areas where we do staffing, it increases the workload for everybody.

Chief Edmonds testified that "[o]n a fairly continual basis we'll have, if not all, most of the units out of service." Chief Edmonds testified the firefighters are fatigued "as a result of the calls and other duties they have." Chief Edmonds said it is rare that a firefighter's "sleep is not interrupted."

Battalion Chief Donald Plucker testified that 10 or 15 years ago, he could get "members [to] come in off duty to staff rigs," but "it's an extreme challenge now . . . to staff the rigs necessary to provide coverage of the city and to provide additional manning at the incidents." Chief Plucker testified the firefighters are overworked and fatigued and "[m]ore and more" firefighters are "calling in sick and injured." The record also shows that in 2014, the number of "days away" the firefighters had due to injury claims with the Department of Labor and Industries was 361. In 2015, the number of "days away" from work increased to 525.

Oregon Health and Science University Sports Medicine Chief and Human Performance Laboratory Director Dr. Kerry Kuehl testified about "fatigue as it relates to safety issues with firefighters." Dr. Kuehl testified, "[W]hen you get fatigued," there are "mental deficiencies as you're not as astute and vigilant." Dr. Kuehl said a firefighter "can maybe get by on some adrenaline for a while. But as that fatigue continues, you lose posture stability, you lose muscular ability."

24

Dr. Kuehl testified about the lack of sleep and disease:

[W]e know that if you get less than six hours of sleep in a 24-hour period — anyone not just firefighters — that's equivalent to smoking a pack of cigarettes a day on your heart. . . .
   The significant thing about that is in firefighters, in our studies that we published, they were getting about 5.7 hours of sleep, and that's across the board in a 24-hour period. So that places them at a high risk for cancer, heart disease, diabetes, metabolic syndrome, but that's the nature of the work. Now, there are certain departments that have less sleep than that depending on call volume, and there's departments that get more sleep than that.

Dr. Kuehl testified, "[W]e know that as call volume increases and firefighters have less chance to get sleep, that cancer, heart disease, and injury rates go up."

For the first time on appeal, the City argues Dr. Kuehl's testimony was "too vague and speculative" under ER 702. The record does not support the City's argument. Dr. Kuehl testified that "when I look at Everett's call volume, . . . there is a correlation between sleep deprivation, fatigue, and injury."

Occupational and environmental medicine expert Dr. Carl Brodkin testified about the "correlation between the call load or the exposure load that firefighters have, and the exposure to disease — the diseases they contract." The expert testimony of Dr. Brodkin supports finding the increased exposure to hazardous conditions, the greater the risk to a firefighter to suffer disease and adverse health outcomes.

Dr. Brodkin testified that "firefighters have unique line-of-duty exposures" to carbon monoxide, nitrogen oxide, and sulfur dioxide from fire smoke. Dr. Brodkin testified that "exposures from [the] firefighting environment" can result in "both acute short-term and chronic long-term health risks."

Dr. Brodkin testified "strong evidence" supports a "relationship to the number of exposures that a firefighter is subject to and disease that may be contracted." Dr.

25

Brodkin described the "concept of dose response" and how "an adverse health affect increases as the exposure increases." Dr. Brodkin stated that "increase in demand and dose response increasing exposure is an important principle for firefighter risk."

Dr. Brodkin testified that different cancers "tend to be dose-response" diseases and the "greater the exposure to the carcinogen, the agent that causes cancer, the greater the risk for developing cancer." Dr. Brodkin said, "Melanoma and other skin cancers associated with light exposure, genitourinary cancers of the bladder and kidney, the brain, and colon cancer are all dose-response diseases. The greater the exposure, the greater the risk." Dr. Brodkin testified, "[O]n a more probable than not basis," dose response and increased exposures creates "increased risk for respiratory disease" in firefighters, a "greater . . . risk for developing cancer," and greater risk for cardiovascular disease.

Dr. Brodkin testified about a study of 360 retired firefighters that showed 77 percent of the retirements "were related to coronary heart disease."

> [T]he evidence of dose response was really in the setting in which this occurred. There was a fifty-fold increased risk — 5,000 percent increased risk with on-duty fire suppression activities, highly statistically significant. As well as a 600 percent increased risk associated with alarms.
>    So these are periods of very high demand and, clearly, this is where the risk for coronary disease occurs. In fact, 30 percent of line-of-duty cardiac incidents of disease presenting occur during fire suppression. The highest demand, period. Even though fire suppression is probably — it's published about 5 percent of firefighter activities, it's 30 percent of coronary heart disease mortality.

In an eight-year study of 812 firefighters in Seattle, Dr. Brodkin found "a marked decline" in "fusing capacity." Dr. Brodkin defined "fusing capacity" as the "ability of oxygen to travel from the airways after we inhale into the blood system through the capillaries of the lung." Dr. Brodkin testified the study showed a "significant association"

between the "greater the number of calls, the greater the risk for the respiratory impact." Another study showed that when "[3] firefighters per ladder or engine" increased to 4, the crews "experienced a 25 percent reduction in time loss injuries as well as a dramatic 71 percent reduction in shifts lost due to injury."

The City contends Dr. Brodkin's reliance on studies related to health concerns and dose response in firefighters was too vague or speculative to show a direct relationship between workload and firefighter safety. We disagree. Without objection, Dr. Brodkin testified:

> Based on the information I've presented I certainly have concluded that firefighting represents a unique operation with substantial health hazards related to exposure and, therefore, exposure-related illness. And increasing work demand, including demand from manning and staffing requirements, including the dose response and the demand and control issues that increase risk for job strain, all of these result in increased exposure not only to chemical agents, but physical stressors, as well as psychological stressors with concomitant risk for disease and adverse health outcomes. And certainly, this would include acute and chronic exposure-related health impacts, including musculoskeletal injury, cardiovascular disease which we've talked about, respiratory disease which we've talked about, occupational cancers, as well as mental health conditions.[16]

The uncontroverted testimony supports the unchallenged finding that states:

> Firefighters have safety interests that are related to shift staffing. When firefighters respond to service calls, they are exposed to hazardous elements that can cause physical and psychological injuries. Some of these elements include smoke, fumes, dangerous chemicals, blood-borne pathogens, and being struck by falling objects or vehicles. The exposure to these elements can lead to immediate injury or illness, or to more long term impacts as a result of cumulative exposure. Responding to increased numbers of service calls increases exposure to risk elements.

We conclude substantial evidence supports finding that the increase in the number of calls responded to during each shift directly impacts the firefighters' safety

---

[16] Emphasis added.

27

and the Union established shift staffing has a demonstrably direct relationship to workload and safety.

We affirm the decision of PERC.

WE CONCUR: